**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael Joseph LEJA,**
**Defendant-Appellant.**

**No. 77–5198.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 18, 1977.

Decided Dec. 22, 1977.

**494**

Gershwin A. Drain, F. Randall Karfonta, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Ronald W. Mellish, Asst. Atty. Gen., Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, ENGEL, Circuit Judge, and CECIL, Senior Circuit Judge.

ENGEL, Circuit Judge.

Michael Leja appeals from his conviction, following a jury trial, on four counts of an indictment charging him with unlawful possession, manufacture and distribution of phencyclidine (PCP), a Schedule III controlled substance, in violation of 21 U.S.C. § 841(a)(1). Count I of the indictment charged him with unlawful possession with intent to distribute approximately 28.61 grams of PCP on November 13, 1975. Count II charged him with unlawfully distributing the same amount of PCP on the same day. Count III charged Leja with the unlawful manufacture of approximately 786.50 grams of PCP on or about November 14, 1975, and Count IV charged him with unlawful possession of the same amount of PCP on the same day with an intent to distribute it.

Leja's conviction of similar offenses under somewhat similar circumstances at a later date was affirmed by our court in *United States v. Leja*, 563 F.2d 244 (6th Cir. 1977), *petition for cert. denied*, —— U.S. ——, 98 S.Ct. 1263, —— L.Ed.2d ——. There, as here, the propriety of the activities of a paid government informer, Theodore Sawicki, was in issue. In *Leja I, supra*, the appellants charged that the government's participation in the commission of the crime, and particularly the role of Sawicki, exceeded the permissible bounds of governmental activity and amounted to a violation of the appellants' due process rights, even though their predisposition to commit the crime precluded the interposition of an entrapment defense. Without approving the government's activity in that case, we declined to reverse where the conduct complained of did not offend the personal right of any defendant, and where our intervention would, in effect, interpose a "chancellor's foot" veto over law enforcement practices of which we did not approve, citing *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

Leja renews his due process argument in this appeal. Here Sawicki testified that in October, 1975, he met Michael Leja, who stated that he had just completed making phencyclidine in his apartment at 63 East Palmer Street in Detroit. Leja stated that he was moving next door to 73 East Palmer and desired to set up another laboratory at that address, but needed some laboratory equipment and chemicals. With the blessing of federal authorities, Sawicki cooperated with Leja's efforts to manufacture PCP and to sell it. The evidence at trial showed that approximately 50% of the chemicals needed to manufacture the PCP was first furnished by undercover government agents. Leja and his partner, Jack Saj, since deceased, were of course anxious to sell the drug, and on November 13, after negotiations, Leja completed the sale of 28.-61 grams to a customer introduced to him by Sawicki. Unfortunately for Leja, the customer was also an undercover government agent. This incident furnished the basis for Counts I and II of the indictment.

On the following day, November 14, drug enforcement agents executed a warrant for the search of Leja's apartment at 73 East Palmer and seized an extensive amount of laboratory equipment, raw materials, and 786.50 grams of PCP. This incident formed the basis for the charges in Counts III and IV.

■ The authorities and rationale which caused us to reject the claim of government over-involvement in the earlier appeal ap-

ply with equal force here. There was ample evidence to support the government's claim that Leja not only was predisposed to commit the crimes but had in fact independently progressed in the manufacture of PCP before there was any government involvement. If anything, the government involvement here was somewhat less than that shown in the earlier appeal.

 Leja's contention, however, that his counsel was unduly restricted in the cross-examination of Sawicki at trial is, however, much more serious, and an examination of the authorities relied upon by both parties convinces us that we must reverse on this account.[1]

Leja's defense was that he was merely an innocent bystander in the whole affair and that the operation was actually carried on by Saj. The success of this defense centered on convincing the jury that Sawicki was altogether unworthy of belief and that his testimony implicating Leja should be discredited. On the cross-examination of Sawicki, Leja's attorney sought to demonstrate to the jury that the witness' livelihood depended entirely upon government compensation for his work as an informer. The defendant's theory was that Sawicki had fabricated the facts of Leja's involvement in order to collect the $1000 per head bounty offered by the government in addition to its regular retainer.

Leja's effort to disassociate himself from the business can hardly be called impressive in view of the evidence. Nevertheless, because the jury deliberated for five hours before returning a verdict, there is at least some indication that he came close to succeeding.

Leja's attorney was, in fact, given a great deal of latitude in the cross-examination of Sawicki. No restriction at all was placed upon his counsel's efforts to bring out all of the facts concerning the government's involvement in the PCP operations. The proofs showed that Sawicki was regularly paid $200 a week for his work on the case, and in addition, received bonus payments for the arrests of Leja and Saj and for the recovery of the PCP. In short, the jury was allowed to consider any possible bias of Sawicki which could arise from the fact that he received a total of $3,300 attributed to his efforts for a period of between three and four weeks.

The district judge, however, ruled that the defense counsel could not offer proof, by cross-examination of Sawicki or otherwise, concerning the total amounts of money, including reward money, received over the period of two to three years that he acted as a paid government informer. The trial judge's ruling is set out below:

THE COURT: Mr. Drain, I had indicated that I would hold an In Camera Hearing to determine the basis upon which the informant had been working for the Government and, of course, you're entitled to ask these questions of Agent Stepp or the informant.

But, the Government—I've indicated to the Government the disclosure that it should make. I can make it or it can make it.

I have indicated to the Government that it should disclose the amount that was paid to him on a weekly basis over a long, continuing period, over the year, and if they wish to show the entire period, they may. I didn't rule on that specifically; he was paid $200.00 a week. That's not at one time, paid $100.00 on twice a week a weekly basis from which he had to pay any expenses, including the

---

1. Numerous other issues are raised on appeal, none of which we find merit reversal if, indeed, there was any error at all. The short period of time between the moment the officers announced their purpose and authority and the moment of their forced entry into the premises to be searched was not unreasonable and did not amount to a violation of 18 U.S.C. § 3109 under all the circumstances of the case, including the known presence inside of the undercover agent. We find nothing inappropriate or improper in the charge to the jury. While we are, of course, obliged to reverse and vacate the judgment, we note in any event that the district court appears to have taken adequate recognition of our decision in *United States v. Stevens*, 521 F.2d 334 (6th Cir. 1975), by imposing but one sentence for Counts I and II and another concurrent sentence for Counts III and IV.

cost of an automobile which was about $300.00 a month.

In addition thereto, he was paid a reward for a—$1,000.00 for any person who was apprehended or who was considered a major violator.

And also, made—and if there were two persons apprehended at one time, as in this case, he was paid for each of them, $1,000.00 and, in addition thereto, he would be paid an award for any major quantity of drugs seized in a—execution of a Search Warrant and he was paid $1,000.00 for a reward for the drugs seized in this case for a total of $3,000.00 in reward in this case and I assume the $3,300.00 which the Government stated, otherwise, was a portion of a time in this case and others. Actually, he was paid on a regular ongoing basis since he was working for them ongoing, every week basis of what I say is the equivalent of a salary and that was the salary, if one might look at it that way, of $200.00 a week from which he had to pay his own cost of a car of $300.00 a month and other expenses, if any.

The Government will also—and I would permit you to inquire whether there were other cases in which he was paid a reward.

However, I do not intend to permit you to ask the total amount of rewards he received because I think it will get into a collateral issue as to whether he was entitled to reward or not. It's his credibility for what he was going to get for his testimony—his information here which I think goes to credibility since the Government will indicate that he did work for them on an ongoing—for over—well over a year and perhaps they are going to indicate the total time; I don't know. It wasn't many years, but it was well over a year. So, of course, he received money thereto and the basis he got the money, you're certainly entitled to know because the question is whether this particular case was motivated by the reward.

MR. DRAIN: Your Honor, is the Court—

THE COURT: That would be my indication of what I would permit you to ask.

MR. DRAIN: The Court is indicating that I cannot ask the total amount that he was paid in rewards?

THE COURT: No, because the reason I'm ruling that way—because I think I ought to state it, then, I would have to have the Government show what he was paid for and I think, to do that, becomes a question whether, in those cases, there was—he was, in fact, giving them accurate information or not and also, I think that we are going to get into the question of the reasonableness of the rewards in all cases and all I can see is a great number of questions about the hazards in those cases and all other matters that we should avoid, to the extent, we can.

The fact he did get rewards in other cases, I believe you can show and the—what he believed the arrangements were, you're entitled to show.

The arrangement was, as I understand it—and you can ask the witness, of course, that he was to get $1,000.00 for any person that the DEA considered a major drug violator. I don't know what their standard for that is.

Let me also say I inquired of Agent Stepp, again, under oath, so far as he knows, this defendant was not arrested by Federal or State agents in connection with violations of his own or any violations. There were no violations that the agent knows of by—any arrest by any local authorities and the arrangements were strictly arrangements they were paying the equivalent of a salary for his services.

So, you can ask him that too, if you want. But, there was no agreement of any kind, either by—certainly, no agreement of any kind by myself or anyone at the DEA, in the DEA who had an agreement with any law enforcement agency that the defendant would not be prosecuted for exchange of cooperation.

Of course, we are aware that his admission and confession would not be a basis for prosecution since the corpus delicti is

independent of the confession which you're aware of.

MR. DRAIN: Your Honor, I would not be interested in, as I indicated before, getting into the justification or validity— the appropriateness of the rewards.

THE COURT: The Government would be entitled to do so and we would be getting into collateral matters.

MR. DRAIN: Your Honor, with all due respects to the Court, I've heard Mr. Mellish make that argument about the time involved—

THE COURT: About the what?

MR. DRAIN: About the time involved in this trial.

THE COURT: It's not on the basis of the time, I don't care about the time. I'm trying one case or another.

It's on the basis of any relevancy.

MR. DRAIN: Your Honor, I think it's highly relevant, in this case. I think the jury has a right to know.

THE COURT: Whether in other cases he was paid for something that he didn't perform?

MR. DRAIN: Your Honor, I'm not—I don't want to get into something he was paid for something he didn't do. I'm concerned with how much he was paid—

THE COURT: Well—

MR. DRAIN: —in total.

THE COURT: I understand, but the basis of payment in other cases is the same basis as payment here. The amount of—paid in the other cases, in my opinion, whether it was—the only reason that you could show was to be bias and prejudice with respect to his testimony here.

MR. DRAIN: That's correct.

THE COURT: The payment in the other cases were based on his testimony and cooperation there, not what he provided in the way of information here or what he expected to get in the way of information here and, therefore as I have said already, I believe it's collateral and I'll not permit you to inquire because it is collateral and not because of the matter of time involved.

As the transcript indicates, the trial judge was concerned that if she permitted testimony concerning total payments, she would also have to permit the government to respond with proof justifying the payments of individual awards not involved in the case, despite defense counsel's protest that he did not desire to contest the justification or reasonableness of any other earned fees.

In *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), Justice Stone reversed a district court conviction where the defense counsel was precluded from eliciting upon cross-examination a witness' current place of residence. The basis of the trial court's exclusion was that the particular witness was in custody at that time, a fact which might bear unfairly upon his reputation and credibility. The trial judge did not, however, restrict any normal inquiry into whether the witness had been convicted of a felony. The Supreme Court held that entirely apart from the right of the defense to show past convictions as bearing upon the general credibility of the witness, the defense counsel was entitled to bring out those facts which would bear upon any bias he might have in his testimony in the particular case, because given under a promise or expectation of immunity or under the coercive effect of his detention by officers of the United States. 282 U.S. at 693, 51 S.Ct. 218. The Court, of course, took care to indicate that cross-examination is not without limits and that there is, in fact, a duty to protect a witness from questions which go beyond the bounds of proper cross-examination merely to harass, annoy, or humiliate the witness. *Id.* at 694, 51 S.Ct. 218. Relying upon its supervisory powers, the Supreme Court held that the restriction constituted an abuse of discretion and hence prejudicial error requiring reversal.

The Supreme Court has also held that restrictions upon the cross-examination by defense counsel in a criminal trial can have the effect of denying the defendant the right to confront witnesses against him, guaranteed under the Sixth and Fourteenth

Amendments. *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), held that the defendant's right of confrontation was denied where the trial court refused to permit defense counsel to inquire into the correct name of the witness who had admitted that he falsely identified himself on direct examination. *See also Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the right of cross-examination was found so fundamental to the Sixth Amendment guarantee that even the protection accorded a juvenile witness from disclosure of his juvenile court record was held to be outweighed by the right effectively to cross-examine that witness to determine whether the fact of his probation status might provide him a motive to testify other than truthfully in the defendant's criminal trial.

Our court has recently affirmed a district court issuance of a writ of habeas corpus where the petitioner's counsel was precluded by the state trial court from cross-examining eye witnesses concerning the suggestiveness of a prior out-of-court identification. *Flowers v. State of Ohio*, 564 F.2d 748 (6th Cir. 1977).

The evidence showed that Sawicki had, before being involved as an informer for the government, been a user of drugs. On direct examination he testified that his motive in helping the government was essentially a desire to combat a very dirty business:

> I chose to work for the Drug Enforcement Administration because at the time when I was, you know, doing all this, you know, making drugs and using them, I see a lot of my friends get hurt by the drugs;
>
> I, myself, was hurt by it. My brain actually wasn't functioning right at the time. It wasn't until I actually stopped using drugs for a couple—that I realized what drugs did to them. A couple—a lot of my friends were killed; a lot of my friends were not the same—

He discounted considerably the economic advantages he was receiving.

If the rate of compensation testified to by Sawicki, $200 a week plus $2500 in rewards for services rendered over three or four weeks, was typical of his rate of reimbursement for the entire period of his employment as an informer, the evidence would tend to show that Sawicki would have been receiving payment at an annual rate of $42,000 and $56,000, a rather heady amount for a person of his background. While the government in its brief characterizes defense counsel's argument that Sawicki was receiving "tremendous amounts of money . . ." as "absurd and . . . not borne out by the facts as elicited at trial", it ill becomes the government to make the assertion when its own objections prevented disclosure of the truth, whatever it may have been.

The best answer to the relevance and, indeed, the vital nature of the information which the defense sought to elicit comes from the appellant's argument that it was not the pay for the immediate case which was so important as the expectation based on past experience, which acts as such a powerful motive for the informer to distort or even to fabricate. As the appellant states in his brief:

> Past rewards are actually more important than remuneration for the case at hand, since pay for the case at hand comes after the work is done. Evidence of past rewards shows what an informant can expect by making a case. It is in making a case that any deceit occurs, for once the case is made, and an investigation terminated by arrest, the testimony is virtually assured.

We recognize that the realities involved in curbing drug abuse require aggressive methods of enforcement, justifying conduct which in gentler circumstances might indeed be distasteful.

> The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but

impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation . . . .

*United States v. Russell, supra,* 411 U.S. at 432, 93 S.Ct. at 1643. If, however, the courts are to refrain from forbidding such conduct, we think it becomes particularly important that the widest latitude in cross-examination be accorded the defense consistent with the concept of an orderly trial.

If relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Federal Rule of Evidence 401, surely the evidence of how much Mr. Sawicki was receiving from the government for past services and might therefore expect in the future was highly relevant to the question of his potential bias and interest.

No claim was ever made that the evidence adduced was intended to harass, annoy, or humiliate Sawicki, or that permitting such questioning might require him in answering it to waive any personal right he might have under the Fifth Amendment. The trial court expressly disclaimed that the motive for its exclusion was any felt need to reduce trial time. Indeed, the question of Sawicki's past compensation could probably have been answered and left for evaluation by the jury in much less time than was consumed by the extensive proceedings which took place out of the hearing of the jury and resulted in the decision to exclude the evidence.

The evidence sought to be elicited was not cumulative, in our judgment, and there was no indication of any overreaching by defense counsel in the cross-examination of the witness. We discern no need on the part of the district court to curb the inquiry based upon any abuse of trial procedures. *See generally* Federal Rule of Evidence 403.

The issue of the scope of cross-examination is before us on a direct review of Leja's conviction. We rest the decision in this case on our supervisory powers and do not determine whether the deprivation rises to constitutional proportions.

Reversed.