George M. **KURZON**, Plaintiff-Appellant,

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES et al.,** Defendants-Appellees.

No. 80–1695.

United States Court of Appeals, First Circuit.

Argued Feb. 12, 1981.

Decided May 22, 1981.

Daniel Burnstein, Boston, Mass., with whom Wilson & Burnstein, Boston, Mass., was on brief, for plaintiff, appellant.

Sandra Wien Simon, Atty., Civ. Div., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., Alice Daniel, Asst. Atty. Gen., and Leonard Schaitman, Atty., Civil Division, Dept. of Justice, Washington, D. C., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, ALD-RICH, Circuit Judge, WYZANSKI, District Judge.*

COFFIN, Chief Judge.

Appellant brought this action in the district court under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to compel disclosure of names and addresses of unsuccessful applicants for research grants from the National Cancer Institute. To support its withholding of this information, the government relied on the authority of exemption 6, which removes from the FOIA's mandatory disclosure requirement "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy", *id.* § 552(b)(6). The district court determined that disclosure, while not significantly advancing the public interest, could substantially injure the professional reputations of the applicants, and entered summary judgment for the government.

Appellant, a physician and former clinical researcher, allegedly wanted to test his theory that the peer review method by which the National Institutes of Health (NIH) evaluate grant applications is biased against unorthodox proposals. He intended to interest a university group in studying rejected projects to determine if innovative research proposals had been fairly evaluated by the peer review system. The district court did not address the question whether the requested information constituted a medical, personnel or similar file, but proceeded directly to balance the privacy interest of the unfunded applicants against the public interest to be served by disclosure. The district court found appellant's proferred justification for disclosure seriously deficient in several respects. The court noted that appellant had failed to present "any direct or probative data" to support his thesis, that his approach was "rather vague and unpromising" and that his suggestion of an ombudsman to be an advocate for innovative research proposals amounted to a "review of the reviewers". An ombudsman would be incompatible, in the district court's view, with the "scholarly and thoughtful reflection" needed for review of grant proposals.

Even assuming that appellant's proposal had merit, the district court doubted that a survey of disappointed applicants, who "would naturally be inclined to possess subjective and possibly unreliable estimations of the worth of their ideas", would be helpful in designing ways to improve the peer review method. The court noted that NIH had conducted its own study of the peer review system and that appellant had failed to contribute to that study, despite an invitation to do so. Finally, the district court found that appellant could obtain the requested information at reasonable cost through alternative means by soliciting names and addresses in scientific publications. Based on these perceived deficiencies in appellant's methodology and proposals for reform, the district court concluded that granting appellant's information request

* Of the District of Massachusetts, sitting by designation.

would advance the public interest only slightly.

The district court next evaluated the privacy interest at stake. While recognizing that the FOIA policy in favor of disclosure would prevail against a minor invasion of privacy, the court concluded that disclosure of the requested information "would be a serious unwarranted invasion of privacy and might reflect opinions about the competence of the applicant or his professional qualifications." The district court reasoned that although a project having high scientific interest could be passed over for reasons unrelated to its merit—for example, because research in that field was a low priority or especially hazardous—rejection might nevertheless convey a sense of failure and permit the inference that the true reason for rejection was lack of merit. Balancing this threat to privacy against the public interest in disclosure, the district court decided that disclosure of the "sensitive personal information" sought by appellant would be clearly unwarranted.

We begin our analysis with the words of the statute. The language of exemption 6 makes its application depend on two criteria: whether the requested information qualifies as a "medical", "personnel" or "similar" file; and whether disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." The government does not contend that the information sought by appellant is a medical or personnel file. Therefore, to determine if exemption 6 was properly invoked, we must inquire whether the names and addresses of unsuccessful grant applicants are sufficiently similar to medical and personnel files to fall within the scope of exemption 6 and, if so, whether disclosure would cause a clearly unwarranted invasion of personal privacy.

While the district court, as noted, did not first address the "similar" file question, we do not consider that omission, in itself, to be erroneous. It is not necessary or even useful in every case for the court to conduct a preliminary inquiry into similarity. By restricting the reach of exemption 6 to cases where the invasion of privacy caused by disclosure is not only unwarranted but *clearly* so, Congress has erected an imposing barrier to nondisclosure under this exemption. *See* K. Davis, *Administrative Law Treatise*, § 5:38, at 424 (2d ed. 1978). When the balance plainly favors disclosure, and especially if the similarity question is also difficult, the wiser and more efficient course is to decide the case on the simpler ground, *see Board of Trade of the City of Chicago v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 398 (D.C.Cir.1980).[1]

These considerations do not justify deferring the similar file inquiry when, as it appeared to the district court in this case, the balance seems to favor nondisclosure. Even when the calculus unequivocally supports withholding—a rare case because Congress has weighted the balance so heavily in favor of disclosure—proceeding first to the balancing inquiry does not obviate a similarity determination since both criteria must be met for the exemption to apply. Both questions, to be sure, require an evaluation of the extent to which disclosure might infringe upon privacy interests, *see Board of Trade of the City of Chicago v. Commodity Futures Trading Comm'n*, *supra*, 627 F.2d at 397. We think, however, that by initially concentrating on the comparable traits of the information requested and the sorts of data compiled in medical and personnel files, the court can focus its attention closely on the type of *privacy* interest Congress had in mind before weighing that interest against the public interest in disclosure. Moreover, in cases where the lack of similarity proves dispositive, addressing that issue first avoids the difficulties inherent in attempting to balance meaningfully widely disparate interests.

---

1. For similar reasons of efficiency, when the requested data obviously satisfies the similar file requirement, the issue does not merit extended consideration. *See Columbia Packing, Co., Inc. v. United States Department of Agri-* culture, 563 F.2d 495, 498 (1st Cir. 1977) ("'records provide a detailed synopsis of each individual's career . . ., data about family relationships, financial information and medical records.'").

One such difficulty, on which we have had occasion to comment before, is illustrated by the district court's scrutiny of appellant's particular plans for making use of the information he requested. The tendency thus to define the relevant public interest narrowly in order to permit a more concrete comparison of public and private interests is understandable, but out of place in this context. In *Columbia Packing Co., Inc. v. United States Department of Agriculture*, 563 F.2d 495 (1st Cir. 1977), we were careful to distinguish between evaluating the weight of the public interest implicated and the likelihood that Columbia (the party seeking certain employment records) would actually use the information requested in a socially beneficial way:

> "While it cannot be known to what extent disclosure of documents to Columbia for use in this administrative proceeding will actually so inform the public at large, Columbia's rights are not lessened, any more than they are enhanced, by the private purpose for which the documents are sought." *Id.* at 499–500.

By considering not only the probable efficacy of appellant's proposed survey but also the worth of his specific suggestions for reform, the district court failed to observe the distinction advanced in *Columbia Packing* between the importance of the subject matter of the request and the prospects of the requester as standard-bearer for the public interest.[2] The several exhibits submitted in support of appellant's motion for summary judgment demonstrated that the peer review method, and particularly its possible stultifying effect on innovative research, were matters of serious and continuing concern within the scientific community. The existence of an NIH study examining the very criticism raised by appellant, though perhaps rendering his efforts redundant, confirms rather than diminishes the importance of appellant's concern.

Had the district court viewed the public interest through a wider lens, it would have accorded greater weight to that interest. Because the court also deemed the harm threatened by disclosure to be substantial, suggesting a close question on balancing interests, it would have done well to consider first the privacy interest at stake, beginning with the question whether the names and addresses requested constituted a "similar file". The common denominator of files covered by exemption 6 has been described as the extent to which they contain "intimate details" of a "highly personal" nature, *Getman v. NLRB, supra* note 2, 450 F.2d at 675, *quoting* H.R.Rep.No.1497, 89th Cong., 2d Sess., 11 (1966); S.Rep.No.813, 89th Cong., 1st Sess., 9 (1965). *See Ferri v. Bell*, 645 F.2d 1213 at 1217 (3d Cir. 1981) ("personal quality"); *Sims v. Central Intelligence Agency*, 642 F.2d 562, 573–74 (D.C. Cir.1980) ("matters of an intimate personal nature"). While exemption 6 was intended to shield against a variety of embarrassing disclosures, the test is not merely whether the information is in some sense personal but whether it is "of the same magnitude—as highly personal or as intimate in nature—as that at stake in personnel and medical records." *Board of Trade of the City of Chicago v. Commodity Futures Trading Comm'n, supra*, 627 F.2d at 398.

---

2. The district court cited *Getman v. NLRB*, 450 F.2d 670 (D.C.Cir.1971) which, in marked distinction to our decision in *Columbia Packing*, emphasized the solid academic credentials of the requesters and the high quality of their proposed study. While we do not doubt that an array of legal scholars as impressive as that mustered in *Getman* is indicative of a substantial public interest, we do not believe that the capability of the individual requester is a proper subject of inquiry under exemption 6, any more than his relative degree of need for or interest in the information. *See Robles v. Environmental Protection Agency*, 484 F.2d 843, 847 (4th Cir. 1973). The purpose of the FOIA is to make information available to the general public. *See, e. g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 143 n.10, 95 S.Ct. 1504, 1513 n.10, 44 L.Ed.2d 29 (1975); *compare* Note, *Invasion of Privacy and the Freedom of Information Act*: Getman v. NLRB, 40 Geo.Wash.L. Rev. 527, 535–36 (1972) (criticizing *Getman* approach as inconsistent with the overall policy of the FOIA) *with* Note, *The Freedom of Information Act: A Seven-Year Assessment*, 74 Colum.L.Rev. 895, 956 (1974) ("*Getman* only establishes the court's prerogative to deny the spurious or patently offensive (albeit insubstantially intrusive) request for information.").

Our consideration of the degree and nature of harm to grant applicants threatened by disclosure leads us to conclude that the information sought in this case is not sufficiently personal or private to satisfy the "similar file" requirement. The degree of intrusion is limited, in the first instance, by the slight informational content of the requested material. The only information sought is a list of names and addresses—business addresses, we may assume—coupled with the knowledge that these applicants' proposals were not funded. As the district court recognized, the loss of privacy involved in disclosing the identities of *all* applicants is minimal; it is only the fact of rejection that raises the possibility of an invasion of privacy. Rejection, moreover, is not so rare an occurrence as to stigmatize the unfunded applicant. The record shows that approximately twice as many applications are rejected as are not.[3]

The evidence of stigma, apart from this statistic, is equally frail. Although the affiants[4] assembled by the government were unanimous in their view that a negative inference "could be drawn" from the fact of rejection, none identified who might be likely to draw such an unwarranted inference. All were agreed, on the other hand, that in fact no such inference should be drawn because of the many possible reasons, unrelated to merit, for rejection. We think the upshot of these statements is that those in a position to influence a researcher's career—his or her superiors and peers—are likely to share the more sophisticated view of the government's affiants that rejection of a grant proposal is not a reliable indicator of merit.

Additionally, we are not persuaded that the nature of the privacy interest threatened, taken in conjunction with the degree of potential harm, warrants the protection of exemption 6. The adverse effect of a rejection of a grant proposal, if it exists at all, is limited to the professional rather than personal qualities of the applicant. The district court spoke of the possibility of injury explicitly in terms of the applicants' "professional reputation" and "professional qualifications". "Professional" in such a context refers to the possible negative reflection on an applicant's performance in "grantsmanship"—the professional competition among research scientists for grants; it obviously is not a reference to more serious "professional" deficiencies such as unethical behavior. While protection of professional reputation, even in this strict sense, is not beyond the purview of exemption 6, it is not at its core.

Finally, federal grant applicants cannot reasonably expect that their efforts to secure government funds, especially in a field so much in the public eye as cancer research, will remain purely private matters. There is an obvious public element to the process and the results, as recognized in the NIH practice of releasing both the applications and identities of funded grant applicants. Nor, evidently, was a promise of anonymity necessary to attract applicants. There was no such promise, either express or implied, as to applicant identities. The best the government can do is to assert a general implied promise of confidentiality based on its policy statement, published in the Federal Register, that "[i]nitial *research* or [a] research training grant *application* on which award is not made" is *"generally* not available" to the public. 45 C.F.R. Part 5, App. (1980) (emphasis added). Though we

---

3. According to the updated affidavit of Dr. Donald S. Fredrickson, Director of NIH, between 1970 and 1979 a grant applicant stood roughly a one in three chance of being funded. Over the ten year period, approximately 70% of all applications were given intermediate approval by the National Advisory Councils affiliated with each NIH institute, and from 1/3 to 1/2 of the council-approved applications were finally awarded funding by NIH. Thus, calculated as a percentage of total applications, the award rate from 1970–79 ranged from a low of 24.5% to a high of 41.8%, and averaged near 30%.

4. In addition to Dr. Frederickson's, affidavits were submitted on behalf of the government by Dr. Robert W. Berliner, Dean of the Yale University School of Medicine and Dr. Thomas Edward Morgan, Jr., Deputy Director of the Department of Academic Affairs and Director of the Division of Biomedical Research at the Association of American Medical Colleges.

need not decide here what effect an affirmative, specific promise of confidentiality might have if one were given, *see Robles v. Environmental Protection Agency, supra,* note 2, 484 F.2d at 846, the lack of such a representation does not aid the government's position in this case.

Those cases that have held the "similar file" requirement satisfied have generally described far greater invasions of privacy than that threatened here. Thus, the Supreme Court in *Department of Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) held "similar" the case summaries of honor and ethics proceedings brought against cadets at the United States Air Force Academy. Even though identifying references were removed from the records, the Court recognized that anonymity could not be guaranteed and that disclosure "could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends." *Id.* at 377, 96 S.Ct. at 1606. The District of Columbia Circuit in *Rural Housing Alliance v. Department of Agriculture,* 498 F.2d 73, 77 (D.C.Cir.1974) held to be "similar" information regarding "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, [and] reputation . . . ." Even in cases arguably closer to this one, the requested information has contained a personal element or likelihood of harm that is lacking here. *See Committee on Masonic Homes of R. W. Grand Lodge v. NLRB,* 556 F.2d 214, 220 (3d Cir. 1977) (union authorization cards containing thumbnail sketch of employees'

job classification and status in addition to union preference); *Wine Hobby USA, Inc. v. IRS,* 502 F.2d 133, 137 (3d Cir. 1974) (disclosure would reveal "personal activities within the home, namely wine-making", as well as "information concerning the family status of the registrant").

Several recent decisions, on the other hand, have held that disclosures affecting privacy to an extent comparable to that present here do not satisfy the "similar file" requirement. The Third Circuit has held that an F.B.I. arrest record, "because of the societal significance attached to [arrest]", clearly lacks the personal quality of a medical or personnel record. *Ferri v. Bell, supra,* 645 F.2d at 1217. In *Board of Trade of the City of Chicago v. Commodity Futures Trading Comm's, supra,* 627 F.2d at 396–400, the District of Columbia circuit discussed the "similar file" requirement at length and concluded that identifying critics of certain provisions of plywood futures contracts implicated commercial interests rather than the personal interests protected by exemption 6. That court has since followed *Board of Trade* in holding that the names and addresses of individual researchers funded by the Central Intelligence Agency do not constitute similar files because of the "clear public concern" regarding federal contractors. *Sims v. CIA, supra,* 642 F.2d at 575.[5] The public character of the process of federal grant application and approval considered here is not, we think significantly different.

For the foregoing reasons the judgment of the district court is reversed.[6]

---

5. *Accord, The Washington Post Co. v. United States Department of State,* 647 F.2d 197 (D.C. Cir. 1981) (*per curiam*) (citizenship and passport records of Iranian residents not similar files); *Simpson v. Vance,* 648 F.2d 10 (D.C.Cir. 1980) (State Department's "Biographic Register", except for facts concerning marital status, not similar file).

6. We find little merit in the government's contention that appellant's request covered only the names and not the addresses of unfunded applicants. Appellant's letter to the Assistant Secretary of Health Education and Welfare and

the Assistant Secretary's reply, both attached as exhibits to the complaint, expressly referred to names and addresses. While the body of the complaint is not a model of good pleading, it expresses appellant's desire to communicate with unfunded applicants. Moreover, the district court assumed that the information at stake was identifying information which would permit direct communication with the applicant. We perceive no prejudice to the government here, nor would any good purpose be served by requiring repetition of the process just completed to obtain addresses.