Kurzon v. HHS                          CV-00-395-JD   07/17/01

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


George M. Kurzon, Jr., M.D.

     v.                                  Civil No. 00-395-JD
                                         Opinion No. 2001 DNH 128
Department of Health and
Human Services,
Public Health Department


O R D E R


The plaintiff, George M. Kurzon, Jr., challenges the
decision of the Department of Health and Human Services ("HHS"),
which denied his request, under the Freedom of Information Act
("FOIA"), seeking the names and addresses of applicants whose
grant applications were not funded by the National Institute of
Mental Health ("NIMH").  HHS moves to dismiss or in the
alternative for summary judgment.  Kurzon also moves for summary
judgment.


Standard of Review

HHS contends that Kurzon's case must be dismissed for lack
of subject matter jurisdiction because it has not improperly
withheld documents under the Freedom of Information Act.  See 5
U.S.C.A. § 552(a)(4)(B).[1]  In order to establish that it has not

_____

[1]Because HHS has filed its answer, the motion to dismiss
would be considered as a motion for judgment on the pleadings.
See Fed. R. Civ. P. 12(c).

improperly withheld documents, however, HHS moves for summary judgment in its favor on Kurzon's claims. Therefore, in essence, the parties have filed cross motions for summary judgment.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). In considering cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

When the party moving for summary judgment also bears the burden of proof at trial, summary judgment will not be granted in the movant's favor unless, based on the record taken in the light most favorable to the nonmoving party, no reasonable jury could find for the nonmoving party. See Winnacunnet v. National Union, 84 F.3d 32, 35 (1st Cir. 1996); see also Laningham v. United

2

States Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In opposing a motion for summary judgment, "[o]n issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991); see also Invest Almaz v. Temple-Inland Forest Prods. Corp., 243 F.3d 57, 76 (1st Cir. 2001). An absence of evidence on a material issue weighs against the party who would bear the burden of proof at trial on that issue. See Perez v. Volvo Car Corp., 247 F.3d 303, 310 (1st Cir. 2001).


Background[2]

On July 9, 1999, George M. Kurzon, Jr. sent a FOIA request to NIMH, seeking disclosure of "a list of the names and addresses of all scientists who were unfunded in the last round of extramural grants made by the NIMH." Def. Attach. A. Kurzon referenced a previous FOIA request he made for similar information from the National Cancer Institute. See Kurzon v. Dep't of Health & Human Servs., 649 F.2d 65 (1st Cir. 1981). The NIMH and the National Cancer Institute are both components of the National Institutes of Health ("NIH"), and FOIA requests to NIMH

_____

[2]Since Kurzon did not provide a statement of material facts either in support of his own motion or in opposition to HHS's motion, all properly supported material facts in HHS's factual statement will be deemed admitted. See LR 7.2(b).

3

are handled by the NIH Freedom of Information Office.

Wendy Baldwin, the Deputy Director for Extramural Research at NIH explained the grant process in her declaration. Extramural grants are for research performed outside of NIH but funded by NIH. Institutions propose a research project for funding by submitting a grant application. Each application identifies a principal investigator who is the individual chiefly responsible for the project. Applications are selected for funding through a system of peer review, which is kept confidential. NIMH, the component of NIH at issue here, receives about 2,670 applications each year and grants funding to only 30% of the applicants.

The grant application "kit" explains the process and policies for grant applications.[3] While the agency makes information about awarded grants available to the public, generally, the agency does not release to the public competing grant applications which were not funded. According to its policy, if the NIH determines that information may be exempt from disclosure under the FOIA, it will notify the applicant or grantee of a FOIA request and consult with the investigator or the institution about releasing the requested information.

---

[3]The excerpt of a grant application "kit" submitted with Baldwin's declaration pertains to Public Health Service grant applications. The excerpt of a policy statement attached to Baldwin's declaration was from the "NIH Grants Policy Statement."

In response to Kurzon's current FOIA request, Susan Cornell of the NIH Freedom of Information Office began the search for the requested information. Cornell learned that the NIH Office of Extramural Research maintained a computer database of all grant applications. That database contained the grant application number, a number code identifying whether the application was withdrawn, the identity of the principal investigator, the investigator's business address, and the amount of funding granted, if any. Cornell requested the list of applications involved in the May 1999 round of grant application review and received forty-nine pages, which included both successful and unsuccessful applicants.

After reviewing the information, Cornell decided that the information about unsuccessful grant applicants was protected from disclosure under Exemption 6 of the FOIA. Cornell concluded that information about the successful applications was not responsive to Kurzon's request and that the grant numbers for those applications were also protected by Exemption 6. Therefore, she found no responsive information that could be disclosed and withheld the entire list, denying Kurzon's request in its entirety.

Kurzon's appeal of Cornell's decision was denied. Kurzon filed suit, seeking review of the decision to deny his FOIA request. HHS states that further review of the list has led to a

5

determination that most of the addresses associated with the unsuccessful applications could be released because they are business addresses that would not reveal the identities of the rejected individual investigators who filed the applications. On February 20, 2001, Cornell sent Kurzon's counsel a list of the addresses with all information that could identify the individual investigators redacted.

## Discussion

FOIA requires government agencies to make their records available to the public upon request, unless a specified exemption applies. See 5 U.S.C.A. § 552(a)(3), & (b). The purpose and policy of FOIA support broad disclosure and narrow interpretation of claimed exemptions. See Church of Scientology Internat'l v. United States Dep't of Justice, 30 F.3d 224, 228-29 (1st Cir. 1994) (stating FOIA policy and purpose and citing cases). A government agency seeking to withhold materials requested under FOIA must provide a relatively detailed justification, one sufficient to give "'the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding.'" Id. at 231 (quoting Wiener v. FBI, 943 F.2d 972, 977-78 (9th Cir. 1991)). When the agency's decision to withhold information is challenged, the court conducts a de novo review.

See id. at 228.

An agency that withholds requested information bears the burden of showing that a FOIA exemption justifies its action. See § 552(a)(4)(B); Maynard v. CIA, 986 F.2d 547, 557-58 (1st Cir. 1993). HHS contends that Exemption 6, 5 U.S.C.A. § 552(b)(6), justifies withholding the information Kurzon requests. Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." § 552(b)(6) (emphasis added).

HHS argues, and Kurzon does not dispute, that information which identifies individual principal investigators whose applications were rejected is covered by "similar files" in § 552(b)(6). See United States Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982) (interpreting "similar files" to include any information applicable to a particular individual). The parties do dispute whether disclosure of the information "would constitute a clearly unwarranted invasion of personal privacy" within the meaning of § 552(b)(6). To resolve that question, the court must weigh the public interest in disclosure against a privacy interest in the requested information protected under the FOIA. See United States Dep't of Justice v. Reporters Comm. for Freedom of the Press ("Reporters Comm."), 489 U.S. 749, 775 (1989).

7

A.  Privacy Interests

Kurzon requested "a list of the names and addresses of all scientists who were unfunded in the last round of extramural grants made by the NIMH."  Cornell Dec., Attach. A.  Since institutions, not scientists, apply for grants, Kurzon's request is understood to ask for the names and business addresses of the principal investigators on unfunded applications.  HHS has provided Kurzon's counsel with a list of the addresses on those applications, which are business or institution addresses, unless the address identified the principal investigator.  HHS has withheld the names and identifying information about the principal investigators, contending that they have a significant privacy interest in not being identified as rejected applicants because of potential harm to their reputations, professional status, and employment opportunities.

1.  Affidavits[4]

In support of the asserted privacy interest, HHS offers the declarations of Susan Cornell, Freedom of Information Officer for NIH; Wendy Baldwin, Deputy Director for Extramural Research at NIH; and Faye Austin, Director for Research, Dana-Farber Cancer

_____

[4]The statements submitted by HHS are unsworn declarations rather than affidavits.  Since the declarations meet the requirements of 28 U.S.C.A. § 1746, however, they will be treated as affidavits subject to the requirements of Rule 56(e).

Institute, Associate Director for Administration, Dana-Farber/Harvard Cancer Center, and Deputy Director, DFCI-Beth Israel Deaconess Medical Center-Children's Hospital Center for AIDS Research. Baldwin and Cornell state that their declarations are based on their "personal knowledge and upon information available to [them]" in the course of their official capacities and duties. Austin states that her declaration is based on the "the consistently expressed expectations and social norms by research scientists and others during my years as a researcher, NIH administrator, and now at the Dana-Farber Cancer Institute." Dec. ¶ 8.

### a. Motion to strike.

Kurzon moves to strike certain parts of Baldwin's supplemental declaration and Austin's declaration on the grounds that those parts do not comply with the requirements of Federal Rule of Civil Procedure 56(e). Rule 56(e) provides in pertinent part that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." "[P]ersonal knowledge is the touchstone" for an analysis under Rule 56(e), and affidavit statements based upon information and

9

belief do not meet the rule's requirements.[5]  <u>Perez</u>, 247 F.3d at 315.

Kurzon challenges paragraphs 2, 15, 16, and part of 18 of Baldwin's supplemental declaration on the ground that the declaration does not include facts showing that she is competent to testify, based on her personal knowledge, about the matters stated.  HHS argues that Baldwin's personal knowledge of the practices and concerns of academic and scientific communities with respect to the expectation of privacy in rejected applications may be inferred from her position at NIH.  Alternatively, she argues that her conclusions would be admissible as lay opinions pursuant to Federal Rule of Evidence 701.

Baldwin holds the position of Deputy Director for Extramural Research at NIH, in which capacity she advises and assists the Director on matters related to funding for medical research and establishes and oversees the implementation of standard procedures for the funding programs.  In support of her argument that an inference may be drawn of personal knowledge based on her NIH position, Baldwin states that she has had a great deal of contact with researchers and institutions.  She does not explain,

---

[5]HHS argues that the standard used in <u>Perez</u> is inapplicable here because the affidavits are not offered to show the defendant's motive.  The court does not agree that <u>Perez</u> is limited to cases involving proof of motive.

10

however, how such contact gave her personal knowledge, in contrast to secondhand knowledge or information, about the privacy interests of rejected applicants.[6] Baldwin's conclusions would not be admissible as lay opinions pursuant to Federal Rule of Evidence 701 due to the lack of foundation for her personal knowledge of those matters. See United States v. Vega-Figueroa, 234 F.3d 744, 755 (1st Cir. 2000); Swajian v. Gen. Motors Corp., 916 F.2d 31, 36 (1st Cir. 1990).

In addition to the reasons discussed above, as to paragraphs 15 and 16, Baldwin prefaces her statements as being based on her belief, rather than her personal knowledge. Since statements based on belief do not satisfy Rule 56(e), those statements are also incompetent for that reason.

Kurzon moves to strike paragraphs 6 and 7 of Baldwin's supplemental declaration, in which Baldwin states that most people would infer that a rejected application lacked scientific

---

[6]HHS argues that Baldwin's experience at a faculty luncheon "associated with a meeting of the Federal Demonstration Partnership" shows that she has personal knowledge of the practices of scientists, researchers, and academics with respect to rejected grant applications. Supp. Dec. ¶ 9. Baldwin states that she asked those attending the luncheon to express their feelings about making the names of unsuccessful applicants public. She reports that "many participants" at the luncheon expressed concern, some said that such information would be disruptive to careers, and some said that it would be a strike against an applicant in the hiring process. To the extent Baldwin's knowledge and experience is based on informal polling of unidentified luncheon participants, it is not persuasive.

11

merit, that such inference would be correct statistically, and that cumulative rejections could be used to develop individual failure rates. Kurzon contends that those statements should be stricken because they are merely conjecture and speculation. Without addressing those statements specifically, HHS argues generally that Baldwin has personal knowledge to support all of her statements and that the statements would be admissible as lay opinion.

As discussed above, Baldwin does not provide any factual basis for her personal knowledge of the practices of the academic and scientific communities with respect to rejected grant applications. Her opinion, that most people would draw negative conclusions, absent foundational facts, would not be admissible pursuant to Rule 701. Therefore, the challenged statements are stricken.

Kurzon moves to strike statements made by Austin in her declaration that she has found it to be "the clear and universal expectation that the fact that a research scientist had his/her grant application rejected is private information" and her belief that employers do not ask about grant applications. Austin Dec. ¶ 8 & 23. Austin bases her statements on "the consistently expressed expectations and social norms by research scientists and others during my years as a researcher, NIH administrator, and now at the Dana-Farber Cancer Institute." Id. ¶ 8. Although

12

Austin apparently has had more direct experience than Baldwin in scientific and academic communities, like Baldwin, Austin's opinions are not based on her own experiences but on what she says have been the experiences and expectations of others. Even if her opinions were admissible as lay opinions, as HHS urges, they are not persuasive. In addition, her statement about the practice of employers not to ask about grant applications is based only on her belief, which is incompetent for Rule 56(e) purposes.

### b.  Probative value of affidavits.

Cornell states in her declaration that based on her consultations with people at NIH, she understood that disclosing the identities of rejected applicants would cause the principal investigators great personal embarrassment and would negatively impact their professional reputations and employment options. Cornell also states that the NIH Grants Policy Statement gave rejected applicants a reasonable expectation of privacy. The policy statement, to which she refers, does not promise privacy to principal investigators whose applications are rejected, but instead says that unfunded applications will "generally" be withheld and repeats the protection of Exemption 6. In addition, the excerpts of the NIH policy and the application "kit," provided in the HHS materials, say that applicant institutions

13

and principal investigators will be consulted about releases of information in response to FOIA requests. Cornell does not say that she consulted with either the institutions or the principal investigators implicated by Kurzon's request. HHS provides no affidavits from any rejected applicants or principal investigators to support Cornell's opinions.

Baldwin, who is familiar with the NIH peer review process, says in her declaration that "one inference that can be readily drawn by being known as a scientist who is unsuccessful in obtaining funding for his or her research proposals is that the scientist, the techniques, or other aspects of the project do not have adequate scientific merit or expertise." Baldwin Dec. ¶ 22. On the other hand, Baldwin says, "Although, in my experience, most people assume that grants are unfunded because the application lacked scientific merit, this is not always the case . . . the pool of unfunded applications includes both excellent ones that fell just beyond the payline, and applications with serious scientific flaws." Id. ¶ 23. Perhaps anticipating the conclusion drawn from such conflicting opinions in Kurzon, 649 F.2d at 69, Baldwin says in her supplemental declaration that the negative assumption against rejected applicants would be correct more often that not.

The inconsistencies persist, however. Baldwin also reports, in her supplemental declaration, concerns about the negative

14

effect disclosure would have on the reputations and careers of young faculty and researchers. In contrast, in her first declaration Baldwin explains that reviewers consider the experience and expertise of the principal investigator and the research team, which would seem to necessarily tip the process against applicants at the beginning of their careers. Since these criteria are not confidential, the potential stigma to a younger or less experienced applicant would be relatively minimized.

Further, as Kurzon points out, to the extent a scientist's record in obtaining funding is germane to his or her career, those who want to know about a particular scientist's record need only ask the scientist. HHS's protestations that confidentiality permits scientists to avoid or hide their application records with impunity is not a persuasive argument.

Austin, who until 1998 worked at NIH in the administration of the extramural research programs, now works at the Dana-Farber Cancer Institute, assisting grant applicants through the application process. Austin states that "the applicant's history of success or failure in obtaining grants is of paramount importance to his/her opportunities for career progression." Dec. ¶ 9. This is because, she says, the unsuccessful applicant loses the money the grant would have provided and must spend more time and money applying again and also loses the recognition that

15

a successful application would provide.  Austin recognizes that all applicants know that more applications are rejected than are granted, but has found that applicants, some more than others, find it demoralizing to be rejected.

Austin further states that in her experience people in competitive institutions, including herself, draw negative inferences from an individual's failure to obtain grant funding. By way of example, Austin says that NIH researchers with more application failures were less likely to be asked to speak at NIH conferences.  She warns against the harm of disclosing the names of rejected applicants which would allow other institutions and employers to use grant success and failure rates in their decision-making, as NIH does.

In contrast, Kurzon offers the affidavits of Bernard J. Bergen, Ph.D., and Roger P. Smith, Ph.D., who taught and engaged in research at Dartmouth Medical School.  Bergen is now a professor of psychiatry, emeritus, at Dartmouth, and Smith is retired.  Bergen states that he applied for three grants from NIMH, two of which were accepted.  Bergen says that the grant application process was very public within his department and that a rejected application did not remain private.  Smith also applied for NIH grants, and stated that the grant application process, including the rejection of applications, was very open in his department.  Smith states that he suffered no harm to his

reputation, professional status, or position due to the rejection of his grant applications.

HHS challenges the affidavits of Bergen and Smith as out of date information based on their experience only at Dartmouth and limited to disclosures within their departments. HHS, however, has not provided evidence that the experiences of Bergen and Smith no longer reflect the atmosphere in their departments at Dartmouth. Although those affidavits are limited to their own experiences in only two departments at one institution, Bergen and Smith provide first-hand information based on those experiences, which is more persuasive than the opinions of Baldwin, Cornell, and Austin, which are based on their conclusions about others' experiences and opinions. HHS also has not shown that Bergen's and Smith's departments at Dartmouth have changed or that academic departments elsewhere operate differently. In addition, according to HHS, the primary harm of disclosure would be the resulting stigma within the scientist's peer group, so a lack of privacy within a scientist's academic department would be significant in view of the asserted harm. Cf. Reporters Comm., 498 U.S. at 770 ("the fact that an event is not wholly 'private' does not mean that an individual has no interest in limiting disclosure or dissemination of the information.") (quotation omitted).

17

## 2. Kurzon v. Dep't of Health and Human Servs.

Kurzon also points to the First Circuit's analysis of similar privacy interests asserted by HHS in response to his previous FOIA request. See Kurzon, 649 F.2d at 68-70. In Kurzon, the court considered the privacy interests implicated by disclosing the names and addresses of unsuccessful grant applicants in the context of whether that information constituted "similar files," within the meaning of Exemption 6. See id. at 69. Since "similar files" was later interpreted by the Supreme Court to mean any information about a particular individual, see Wash. Post Co., 456 U.S. at 602, the First Circuit's more restrictive interpretation no longer controls the application of Exemption 6. Nevertheless, the First Circuit's analysis of the privacy interests implicated by disclosing the names and addresses of unsuccessful grant applicants is instructive in this case.

In Kurzon, the court concluded that "[r]ejection . . . is not so rare an occurrence as to stigmatize the unfunded applicant." Kurzon, 649 F.2d at 69. As remains the case now, between 1970 and 1979, only 30% of applicants were funded. See id. at 69, n.3. HHS has not presented any persuasive evidence that being part of the 70% of applicants whose applications for grants are rejected is more stigmatizing now than it was twenty years ago. Although Baldwin and Austin contend that the

18

application process is now more competitive, that would suggest less rather than more stigma for a rejected applicant.

In addition, the Kurzon court noted that the NIH did not promise anonymity to applicants, that applicants recognized the public nature of the research and the application process, and that anonymity was not necessary to secure applicants.  See id. at 69-70.  Similarly, nothing in the record presented here shows that rejected applicants reasonably expect that their identities will always be kept confidential.  The cited provisions of the application kit and policy statement simply repeat the language from Exemption 6.  HHS has also provided no evidence, under seal or otherwise, from any rejected applicants to support HHS's theory that they expected privacy or that disclosure of their names would have a negative effect on them personally or professionally.  In addition, HHS has not shown or even suggested that the decision in Kurzon, requiring disclosure of the names and addresses of rejected applicants, has had a negative effect of any kind on rejected applicants whose names were disclosed or on the application process.

### 3.  Conclusion

HHS argues persuasively that achieving grant funding is important to scientists for personal and professional reasons. Scientists who do not achieve grant funding for any reason,

19

including their failure to apply, will suffer the predictable negative effects of a lack of funding. That is, a lack of funding may make it untenable for a rejected applicant to achieve or continue in a particular position or to maintain a research project. In that regard, a scientist's successes and failures in obtaining funding are likely to be apparent--some will have money and some will not. The record does not establish that the primary harm of a rejected application is stigma, which might support a privacy interest, rather than a lack of funding, which is likely to be apparent rather than private. Given these general realities shown by the summary judgment record, HHS has not established that rejection of an NIH grant application is significantly stigmatizing to the rejected applicant so as to implicate a significant privacy interest.

HHS has shown that the receipt of grant money is important and that NIH believes that disclosure of the identities of unsuccessful applicants for NIH grants would have a significant stigmatizing effect. HHS has not shown, however, that NIH's view is widely held in pertinent research environments or by the public in general. Therefore, while the record shows it is better to be successful than unsuccessful, the record does not show that unsuccessful applicants have a significant privacy interest in withholding their identities.

Taking the facts in the light most favorable to Kurzon, HHS

20

has not established a significant privacy interest in the identities of rejected applicants in support of its own motion. In the context of Kurzon's motion, taking the facts in the light most favorable to HHS, the court will accept that rejected applicants have something more than a de minimis privacy interest in that information but something less than a significant interest.

B.  Public Interest

The public interest side of the equation is based on the relationship between the requested information and the FOIA policy of full disclosure which "focuses on the citizens' right to be informed about 'what their government is up to.'" Reporters Comm., 489 U.S. at 773; accord FLRA v. United States Dep't of Navy, 941 F.2d 49, 56 (1st Cir. 1991).  "Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." Reporters Comm., 489 U.S. at 773.  The specific purposes for which the information was requested and the identity of the requester do not affect the public interest analysis.  See FLRA, 941 F.2d at 56.

Kurzon contends that disclosure of the names and addresses of unsuccessful applicants for NIMH grants is necessary to permit

21

public scrutiny of the peer review process of awarding grants.[7] Kurzon believes that the peer review system does not sufficiently recognize the value of innovative cutting-edge research. Baldwin establishes in her declaration that the peer review process is kept entirely confidential by NIH.

Kurzon argues that the names and addresses of unfunded applicants would allow the public to assess the review process by contacting unfunded applicants and developing further information about the application and review process from them. Kurzon also contends that some evaluative information is provided by the names of the rejected applicants alone because the names would shed light on the process to the applicants' colleagues within the pertinent research area or peer group. HHS contends that the public interest must be served directly by the requested information, not by a derivative use of that information to develop further information about the agency.

The Supreme Court has declined to rule on the public interest value of derivative use information. See United States Dep't of State v. Ray, 502 U.S. 164, 178 (1991). At a minimum, however, public interest in derivative use information must be based on more than "[m]ere speculation about hypothetical public

---

[7]Kurzon's own personal reasons for requesting the names and addresses, to inform unfunded applicants of a website or other sources for private funding, are irrelevant. See Bibles v. Oregon Natural Desert Ass'n, 519 U.S. 355 (1997).

22

benefits." <u>Id.</u> at 179. In the context of a request for home addresses of union bargaining unit employees, the Supreme Court held that the public's interest in disclosure was "negligible, at best" because "such disclosure would reveal little or nothing about the employing agencies or their activities." <u>United States Dep't of Defense v. FLRA.</u>, 510 U.S. 487, 497 (1994).

Before those cases were decided, the First Circuit concluded that disclosure of the home addresses of union bargaining unit employees was not necessary to serve the public interest in "tapping into a source of information about government operations" and labor practices because the employers' addresses were available, which made it possible to contact the employees at work.[8] <u>FLRA</u>, 941 F.2d at 57; <u>see also</u> <u>Navigator Publ'g, L.L.C. v. United States Dep't of Transp.</u>, 2001 WL 605121, at *2-3 (D. Me. June 4, 2001). The District of Columbia Circuit has established a bright line rule that a public interest exists in disclosure only if "'the public would learn something directly about the workings of the <u>Government</u> by knowing the names and addresses [of certain private individuals].'" <u>LePelletier v. FDIC</u>, 164 F.3d 37, 47 (D.C. Cir. 1999) (quoting <u>Nat'l Ass'n of</u>

---

[8]The court in <u>Kurzon</u> discussed the district court's evaluation of the public interest in the names and addresses of unsuccessful applicants for research grants and identified the proper public interest as an investigation into the peer review method and its "possible stultifying effect on innovative research." <u>See</u> <u>Kurzon</u>, 649 F.2d at 68.

23

Retired Fed. Employees v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989)).  Other circuits also have been reluctant to afford weight to a public interest based on the derivative use of information, particularly when the asserted privacy interest is significant, as in the case of home addresses, or the information is available from other sources.  See, e.g., Sheet Metal Workers v. Dep't of Veterans Affairs, 135 F.3d 891, 903-04 (3d Cir. 1998) (discussing cases); Sheet Metal Workers Int'l Ass'n, Local No. 9 v. United States Air Force, 63 F.3d 994, 998 (10th Cir. 1995) (same); Painting Indus. of Haw. v. Dep't of Air Force, 26 F.3d 1479, 1485 (9th Cir. 1994) (same).

The circumstances presented in this case are apparently unique, however.  Kurzon seeks the names and business addresses of unsuccessful principal investigators, not their home addresses.  HHS has disclosed most of the addresses but has withheld the principal investigators' names and any address that would identify the principal investigator.  Kurzon requests disclosure of the names so that unsuccessful principal investigators can be contacted in their professional capacities about the application and peer review process.[9]

---

[9]Kurzon also argues that a direct public interest exists in disclosure of the names themselves because colleagues and peers of the rejected applicants, who are familiar with the proposed projects, would then be able to evaluate the NIH process.  The "public" in this context is only the peer group of each

24

It is undisputed that NIH maintains the confidentiality of the review process that resulted in rejection of the applications. Although the institutions or businesses whose applications were rejected could be contacted, HHS has not shown that absent the name of the principal investigator, the public would be able to effectively ask about particular rejected applications. Successful applicants could also be contacted, because their names and addresses are disclosed by the NIH, but their experiences would shed no light on the review process which leads to a rejection. Therefore, disclosure of the names of unsuccessful principal investigators, coupled with their business or institutional addresses, appears to be the only means for public investigation into NIH's application review process. Of course, the extent to which each individual scientist contacted would cooperate in such an investigation would be entirely up to that individual.

Kurzon has identified a public interest in the disclosure of the names of the principal investigators for unsuccessful NIMH grant applications in the May 1999 round of grants to be used to

individual unsuccessful applicant. It appears to be equally likely, based on the Smith and Bergen affidavits, that a peer group, familiar with an unsuccessful applicant's project, will also know when an application is rejected. Disclosure of the names of unsuccessful applicants, therefore, would not be necessary to serve this asserted public interest.

obtain other information about the NIH application review process.  Because derivative use information is of questionable value in this context, the weight of the identified public interest is uncertain.  For purposes of Kurzon's motion for summary judgment, the interests must be balanced to determine whether HHS is justified in withholding the information.

C.  Balancing

In order to determine whether disclosure of the names would constitute a clearly unwarranted invasion of personal privacy, the court must weigh the privacy interest in the information against the public interest in disclosure.  See Reporters Comm., 489 U.S. at 775.  Here, based on the record presented, neither the privacy interest nor the public interest is particularly compelling.  For that reason, the balancing process leaves the interests at near equipoise.  Nevertheless, "'disclosure, not secrecy, is the dominant objective of [FOIA].'"  Dep't of Interior v. Klamath Water Users Protective Ass'n, 121 S. Ct. 1060, 1065 (2001) (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976)).  For that reason, exemptions are to be applied narrowly.  See id.

HHS bears the burden of showing that Exemption 6 applies. To carry that burden, HHS must show that disclosure of the names of the unsuccessful principal investigators constitutes a clearly

26

unwarranted invasion of personal privacy. HHS has not carried that burden. Based on the record presented for summary judgment, HHS has not established that Exemption 6 justifies withholding the names of unsuccessful principal investigators from the May 1999 round of application review or demonstrated that factual issues remain for trial. Therefore, Kurzon is entitled to summary judgment, and the requested names shall be disclosed.

## Conclusion

For the foregoing reasons, the plaintiff's assented-to motion for an extension of time to file a reply (document no. 18) and the motion to strike (document no. 19) are granted. The defendant's motion to dismiss or in the alternative for summary judgment (document no. 5) is denied. The plaintiff's motion for summary judgment (document no. 8) is granted.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

July 17, 2001

cc: William L. Chapman, Esquire
    Gretchen Leah Witt, Esquire

27