**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Donald James TOUCHSTONE; Charles D. Godwin, Defendants-Appellants.**

**Nos. 82–1144, 82–1241.**

United States Court of Appeals, Sixth Circuit.

Argued March 11, 1983.

Decided Jan. 31, 1984.

Rehearing and Rehearing En Banc Denied March 22, 1984.

---

John C. Mouradian, argued, Farmington Hills, Mich., Gershwin A. Drain, Kenneth

Sasse, argued, Detroit, Mich., for defendants-appellants.

Leonard R. Gilman, U.S. Atty., Maura D. Corrigan, Robert M. Morgan, argued, Asst. U.S. Attys., Detroit, Mich., for plaintiff-appellee.

Before EDWARDS and ENGEL, Circuit Judges, and WEICK, Senior Circuit Judge.

ENGEL, Circuit Judge.

Donald Touchstone and Charles D. Godwin were convicted of conspiracy to distribute heroin and cocaine in violation of 21 U.S.C. § 846. Touchstone was also convicted of possession of heroin with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).

Touchstone and Godwin present three issues on appeal:

1. That certain evidence offered against Touchstone at trial was the product of an illegal search;

2. That the district court erred in allowing the government to introduce evidence of defendants' flight during their trial, and that the court's instruction on this point constituted reversible error;

3. That the district court improperly limited defendants' cross-examination of a government witness.

We affirm.

## I.

The district court properly denied Touchstone's motion to suppress. Touchstone was arrested on March 17, 1977, after the police stopped a car in which he was a passenger. When the car was stopped because of a traffic violation, the driver, Charles Truitt failed to produce a license on request and was arrested. The police then asked Truitt whether he wanted them to turn the car over to one of the passengers. In connection with this inquiry, the police asked to see Touchstone's driver's license. When Touchstone opened his overcoat to retrieve his license, police saw the end of a knife protruding from an inner jacket pocket. Concluding that the exposed knife was

more than three inches long and thus violated a municipal knife ordinance, the police arrested and handcuffed Touchstone and placed him in the rear seat of a patrol car. Once in the patrol car, Touchstone was observed removing coin envelopes containing a white powder from his clothing. Police recovered twenty-one coin envelopes containing a substance later identified as heroin. This heroin was the basis of the substantive charge against Touchstone.

At the suppression hearing the parties offered conflicting evidence as to the discovery of the knife. The police testified that the knife was in "plain view," while Touchstone argued that the knife was recovered as the result of an illegal patdown. The district court chose to credit the testimony of the officers, and denied the suppression motion.[1]

On appeal, Touchstone argues that the court's finding that the knife handle was in "plain view" is clearly erroneous. *United States v. Jabara,* 644 F.2d 574, 577 (6th Cir.1981). The defendant contends, therefore, that the search was illegal because the police had no articulable suspicion that their safety, or that of others, was in danger as required by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because the trial court's finding is supported by the testimony of two police witnesses, we decline to find the ruling "clearly erroneous."

## II.

Next appellants urge that the district court erred in admitting evidence of their flight during trial and in instructing the jury on this aspect of the proceedings.

Defendants Touchstone and Godwin appeared in court on December 12 and 13, 1979, for the commencement of their trial.

On December 14, 1979, both defendants failed to appear, and the trial court ruled that they had voluntarily absented themselves from the trial. Defendants were then tried and convicted *in absentia* pursuant to Federal Rule of Criminal Procedure 43(b)(1), which provides that a defendant may be tried and convicted when he "voluntarily absents himself after the trial has commenced."[2]

The trial judge, over objections by the defense, allowed the prosecution to present evidence concerning defendants' absence from the trial.[3] Agents testified about their unsuccessful efforts to locate the defendants, and Godwin's mother testified concerning phone conversations she had had with her son after his flight. These conversations indicated that Godwin was alive and able to appear. The trial court's instructions concerning the defendants' flight allowed the jury to consider their absence at trial as evidence of their guilt or innocence. The court instructed:

> There has been evidence in this case of the absence of the defendants Godwin and Touchstone during the course of the trial, from which you may or may not find that those defendants fled intentionally.
>
> The intentional flight or concealment of a defendant after he is accused of a crime that has been committed, is not, of course, sufficient in itself to establish his guilt; but is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence. Whether or not the evidence of flight or concealment shows a consciousness of guilt, and the significance to be attached to any such

---

1. Defendant Touchstone relied primarily on police reports which were silent about observation of a knife handle prior to the frisk.
   The district court chose to rely instead on the testimony of two officers at trial.

2. Fed.R.Crim.P. 43(b)(1) provides:
   (b) **Continued Presence Not Required.** The further progress of the trial to and including the return of the verdict shall not be prevented and the defendant shall be considered to have waived his right to be present whenever a defendant, initially present,
   (1) voluntarily absents himself after the trial has commenced (whether or not he has been informed by the court of his obligation to remain during the trial) . . .

3. Despite the flight of their clients, counsel continued to defend Touchstone and Godwin during the trial.

evidence, are matters exclusively within the province of the jury.

In your consideration of the evidence of flight or concealment, you should consider that there may be reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness. Let me suggest, also, that a feeling of guilt does not necessarily reflect actual guilt.

The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn, from the failure of a defendant to testify.

Defendants' counsel generally objected to this instruction at trial, and specifically objected to the failure of the "flight" instruction to include an "immediacy" requirement. Pointing to the lapse of time between the crime and defendants' flight, a period of almost three years, defendants asserted that the prejudicial effect of the "flight" evidence outweighed its probative value and, consequently, no proof regarding the defendants' absence should be admitted.[4] The defendants also cited *Devitt and Blackmar* in support of their argument that flight instructions usually contain an "immediacy" element.[5]

In support of their position, defendants primarily relied upon *United States v. Myers,* 550 F.2d 1036 (5th Cir.1977), cert. denied, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978), which discusses immediacy and the probative value of "flight" evidence:

The immediacy requirement is important. It is the instinctive or impulsive character of the defendant's behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses. *See generally* Hutchins & Slesinger, *Some Observations on the Law of Evidence—Consciousness of Guilt,* 77 U.Pa.L.Rev. 725, 734–35 (1929). The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.

*Id.* at 1051. On appeal, defendants argue that their "flight" was so remote in time "from the commission or accusation of an offense" that it was not probative of consciousness of guilt. We disagree.

■■■ Our review of the law satisfies us that "flight" is generally admissible as evidence of guilt, and that juries are given the power to determine "how much weight should be given to such evidence." *United States v. Craig,* 522 F.2d 29, 32 (6th Cir. 1975). Moreover, cases following *Myers* have indicated that immediacy "generally only becomes important in those cases where the defendant does not know, or his knowledge is doubtful, about the charges and accusations made against him." *United States v. Hernandez-Miranda,* 601 F.2d 1104, 1106 (9th Cir.1979). The "importance of the immediacy factor would be greatly diminished, if not rendered irrelevant, when there is evidence that the defendant knows that he is accused of and sought for the commission of the crime charged." *United States v. Jackson,* 572 F.2d 636, 641 (7th Cir.1978).[6] The cases cited by the defend-

---

**4.** Donald Touchstone was arrested on March 17, 1977. Defendants Touchstone and Godwin were indicted on June 19, 1979, and their trial began on December 13, 1979.

**5.** *1* E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions,* § 15.08 (3d Ed.1977) states:

The intentional flight or concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not of course sufficient in itself to establish his guilt; but is

a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence. Whether or not evidence of flight or concealment shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

**6.** The *Jackson* court approved the use of the following "flight" instruction in cases where the defendant had knowledge that he was accused or sought for the crime charged:

ant in which courts held "flight" instructions to be error, invariably involved defendants who were unaware at the time of their flight that they had been charged with a crime. *See, e.g., United States v. Myers,* 550 F.2d 1036 (5th Cir.1977), *cert. denied,* 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978); *United States v. White,* 488 F.2d 660, 662 (8th Cir.1973); *Embree v. United States,* 320 F.2d 666 (9th Cir.1963).

The defendants in this case disappeared on the third day of their trial and were obviously well aware of the charges against them. Similarly, in *United States v. Hernandez-Miranda,* 601 F.2d 1104 (9th Cir. 1979), the defendant fled immediately prior to his scheduled trial. The court there held that "flight immediately after the commission of a crime, or immediately prior to trial, both support an inference of consciousness of guilt." *Id.* at 1107. In *United States v. DeLeon,* 498 F.2d 1327, 1331 (7th Cir.1974), the court held that flight during trial likewise may support an inference of consciousness of guilt.

Therefore, we hold that the trial court did not commit error in omitting an immediacy element when it instructed the jury on the "flight" of the defendants. Considered as a whole, the "flight" instruction was admirably neutral and fully complied with relevant case law. We can find no fairer, more balanced statement of the law concerning "flight" than that actually given by the court in this case.

## III.

The third and most serious issue in this appeal is defendants' claim that the district court improperly limited defendants' cross-examination of Bobby Marshall, an important government witness.

Bobby Marshall testified that he and his uncle, Walter Cason, controlled a large heroin distribution network in Detroit of which Godwin and Touchstone were members. Godwin "was sort of like a bookkeeper" for the organization, while Touchstone recruited runners to distribute the heroin and collected the money received by the runners. Marshall testified for the government [7] pursuant to a plea agreement entered into under Federal Rule of Criminal Procedure 11(e)(1)(C). Under that agreement, Marshall pleaded guilty to the first of four counts of an indictment concerning two murders. Marshall agreed to be debriefed, to testify truthfully in the case against Touchstone and Godwin, and to provide information to state authorities regarding the two homicides. In return, the government promised that Marshall's maximum sen-

---

The intentional flight or concealment of a defendant *immediately after the commission of a crime, or after he is accused of a crime that has been committed,* is not of course sufficient in itself to establish his guilt; but is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence. 572 F.2d at 641, *citing 1* E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions,* § 15.08 (3d Ed.1977) (emphasis added). The above instruction is identical to that used by the trial judge here, *see supra* p. 4, except for the words "immediately after the commission of a crime." The trial judge utilized the second part of the clause underlined above, of course, because it is the portion of the suggested instruction which applies to the facts of this case.

7. The investigation in this case was a cooperative venture of state and federal authorities. State officials were involved in the investigation and negotiations leading to Marshall's plea of guilty on one of several counts relating to his involvement in two homicides.

The parties appear to disagree as to the type of immunity Marshall received from the state. Defendant's briefs assert that the immunity received was "transactional immunity"—i.e. absolute immunity concerning the two murders. The government argues that Marshall received only "use immunity"—i.e. Marshall was promised only that information received from him, or evidence derived from such information, would not be used against Marshall in a prosecution involving two homicides.

The Rule 11 plea agreement suggests that Marshall was promised use and not transactional immunity. The relevant paragraph states:

The undersigned representative of the Wayne County Prosecutor's Office does hereby promise and agree that any information received from the defendant or other evidence derived from said information will not be used against the defendant concerning the above-described homicides.

The plea agreement was signed by Marshall and his attorney.

tence on Count One of the federal indictment would be one year imprisonment, that the three remaining counts of the indictment would be dismissed, that the government would make a non-binding recommendation to the court of a sentence of probation on the conviction, and that Marshall and his wife would be protected and relocated under the Federal Witness Protection Program. In addition, as part of the agreement, a representative of the Wayne County Prosecutor's Office promised that information provided by Marshall or evidence derived from such information would not be used against Marshall in a state prosecution for the two homicides mentioned above. The problem in the present case concerns the promises made to Marshall by the State of Michigan.

At trial, cross-examination of Marshall consumed nearly four days of testimony. The jury learned that Marshall had originally been charged in four separate counts, each of which carried a maximum sentence of fifteen years, and that under his plea agreement Marshall would receive a sentence of no more than one year imprisonment. It was made clear that Marshall had not yet been sentenced at the time he testified, and that his "deal" with the government was conditioned upon his testifying at defendant's trial. Marshall also testified that he expected the government to recommend a probationary sentence in his case, and that he had been told that in most cases the judge followed the government's recommendation. Marshall also admitted that his testimony was motivated in part by self-interest and that he did not "want to do any time." Finally, Marshall revealed that at the time of the trial the government was paying him $850 per month.

In addition to cross-examining Marshall concerning his motive for testifying, defense counsel impeached the witness' character by presenting a litany of bad acts committed. The defense showed that Marshall had run away from home as a juvenile and lived in the streets, committing break-ins and thefts. The jury also learned of Marshall's prior convictions for attempted breaking and entering and delivery of heroin, and was told of Marshall's role as an "enforcer" in the Cason organization. Marshall admitted pistol-whipping members of the Cason organization, and assaulting and threatening addicts and runners.

Defendants also requested, however, that they be allowed to inquire into the homicides which were the basis of Marshall's agreement with the State of Michigan. Although the trial court recognized that this inquiry went "to the bias of the witness," it denied these requests because co-defendants of Touchstone and Godwin—and perhaps even Godwin himself—would be prejudiced by the admission of evidence concerning the two murders:

THE COURT: As I indicated off the record, and I will repeat now, I really know of no authority on this particular issue, and I certainly know of no authority that would permit me to balance the interest of various defendants when one could be implicated in a murder, and particularly since it would appear that at least one of the homicides in question could be considered as conduct in furtherance of a conspiracy.

I think that the circumstances here dictate that I prohibit Mr. Lawson from making inquiry that he wishes to make. I do so because even though without question it goes to the bias of the witness, the prejudicial effect it would have on other defendants, including Mr. Godwin himself—although I don't have any authority or right to determine what his strategy should be—nevertheless, that prejudice would be of an inflammatory nature, it prompts the Court to prohibit that inquiry by Mr. Lawson.

On appeal, defendants argue that their rights to confrontation under the Sixth Amendment were violated by the trial court's refusal to allow cross-examination of Marshall concerning the immunity he received from the State. The government responds that the impeachment value of the immunity provided in the plea agreement was slight, and that the cross-examination of Marshall conducted by the defense gave

the jury the facts necessary for a discriminating appraisal of his credibility.

The Supreme Court's principal statements on the right of cross-examination are found in *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931) and *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Alford,* questions regarding "the witness's place of residence were excluded on the government's objection that they were immaterial and not proper cross-examination." 282 U.S. at 688, 51 S.Ct. at 218. Defense counsel had informed the court that the witness was in federal custody and had argued that this fact was relevant for the purpose of showing bias or prejudice. *Id.* at 690, 51 S.Ct. at 219. In reversing the circuit court's decision affirming defendant's conviction, the Supreme Court emphasized that "cross-examination of a witness is a matter of right," and that the cross-examiner must be given "reasonable latitude" in developing facts tending to show that the testimony in chief was untrue or biased. *Id.* at 691–92, 51 S.Ct. at 219–220. The Court recognized that a proper cross-examination could have suggested to the jury that the witness' testimony "was biased because [it was] given under promise or expectation of immunity." *Id.* at 693, 51 S.Ct. at 220. The court noted that since the extent of cross-examination is within the trial court's sound discretion, the court may reasonably determine when a subject is exhausted. *Id.* at 694, 51 S.Ct. at 220. However, trial courts may not "cut off *in limine* all inquiry on a subject with respect to which the defense was entitled to a reasonable cross-examination." *Id.* This is "an abuse of discretion and prejudicial error." *Id.*

In *Davis,* the Supreme Court again reversed a conviction where the trial court had unduly restricted cross-examination. A juvenile on probation had provided crucial testimony for the prosecution. The defense sought to show that the juvenile's testimony was motivated by a concern that his probation would be revoked if his testimony was unfavorable to the government. At trial, the prosecutor moved for a protective order to prevent the defense from referring to the juvenile's record in the course of cross-examination. The trial court granted the motion, relying on a state statute designed to protect the anonymity of juvenile offenders. Although the juvenile admitted that it crossed his mind that the police might suspect him of the crime, the defense was prevented from developing its theory that the juvenile's testimony was motivated by a concern for his probation status. The Supreme Court granted certiorari in order to consider whether the scope of cross-examination permitted by the trial court was adequate under the Sixth Amendment's Confrontation Clause.

In holding that the trial court had improperly restricted cross-examination, the Supreme Court reiterated its belief that: "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.... The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" *Id.* at 316, *citing* 3A J. Wigmore, Evidence § 940, at 775 (Chadbourn rev. 1970). The Court concluded that defense counsel should have been allowed "to make a record from which to argue *why* ... [the juvenile] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318 (emphasis in original).

*Alford* and *Davis* reveal the Supreme Court's concern that defendants be given an adequate opportunity to expose bias and prejudice on cross-examination. These cases also recognize, however, that the extent of cross-examination is within the "sound discretion" of the trial judge. *Alford,* 282 U.S. at 694, 51 S.Ct. at 220. Moreover, *Alford* and *Davis* were cases in which the trial judge blocked all or nearly all inquiry into a key witness' motive for testifying. This important feature of *Alford* and *Davis* is of significance in the present inquiry.

Defendants have cited numerous cases in which trial courts completely precluded cross-examination concerning a witness'

motive for testifying. *United States v. Withers,* 637 F.2d 445 (6th Cir.1980); *Chavis v. North Carolina,* 637 F.2d 213 (4th Cir. 1980); *Spaeth v. United States,* 232 F.2d 776 (6th Cir.1956); *Sandroff v. United States,* 158 F.2d 623 (6th Cir.1946); *Farkas v. United States,* 2 F.2d 644 (6th Cir.1924). In each case, the court held that complete preclusion of cross-examination as to motive was an abuse of discretion. Likewise, courts have found an abuse of discretion where a limited amount of cross-examination was permitted, but defendants were prevented from developing their theories regarding a witness' motives for testifying. *United States v. Leja,* 568 F.2d 493 (6th Cir.1977); *United States v. Garrett,* 542 F.2d 23 (6th Cir.1976). In *Leja,* for example, the trial court allowed defendants to show that a government witness had received $3,300 in government payments for his work on defendants' case. Defendants were prevented from revealing, however, that the witness' total compensation as a government informant was between $42,000 and $56,000 per year. The court held that this limitation on cross-examination improperly prevented the defense from developing its theory "that the witness' livelihood depended entirely upon government compensation for his work as an informer." 568 F.2d at 495.

Where a trial court has limited but not totally precluded cross-examination as to motive, "the issue is whether the jury was otherwise in possession of sufficient information concerning formative events to make a 'discriminating appraisal' of a witness' motives and bias." *United States v. Campbell,* 426 F.2d 547, 550 (2d Cir.1970). *See also United States v. Mahler,* 363 F.2d 673, 677 (2d Cir.1966); *Flemmi v. Gunter,* 410 F.Supp. 1361, 1371 (D.Mass.1976).

In this case, while the information regarding the homicides was indeed relevant to the question of the witness' motive in testifying, the trial judge nonetheless properly excluded it. Plainly, there must be some limitation upon such questions, or the trial becomes a trial of the witness and not of the defendant. We are unable to agree with the government's contention that revealing to the jury the witness' immunity from possible prosecution for two homicides is of "slight" impeachment value. Nevertheless, we are satisfied that the otherwise extensive cross-examination of Marshall did provide the jury with ample information to enable it to make a discriminating appraisal of his credibility.

Given the extensive cross-examination permitted here and the concern of the trial court that the testimony of the witness might even implicate one of the defendants, Godwin, in crimes for which he was not then on trial, we are satisfied that no error was committed under these particular circumstances. While the potential prejudice to Godwin is apparent, Touchstone might also have been adversely affected by Marshall's testimony concerning the murders, particularly given the proof of the relationships between Marshall, Godwin and Touchstone. The revelation that Godwin and Marshall were associated with a drug ring engaged not only in drug distribution, but in murder, could have had the spillover effect of prejudicing the jury against Touchstone as well. Had the evidence been admitted and the defendants still convicted, defense counsel's role in introducing such prejudicial information before the jury might have given rise to a claim for ineffective assistance of counsel. Moreover, its introduction would have further detracted from the actual trial by continuing to focus the jury's attention on a cross-examination that had already lasted four days. Under such circumstances, the trial court was faced with a dilemma which in our opinion it properly resolved.

The judgment of the district court is AF-FIRMED.