25 F.3d 1051
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Eugenio ESTRADA, Eusibio Toledo-Yin, Defendants-Appellants.
 Nos. 92-4268, 93-3038.
 United States Court of Appeals, Sixth Circuit.
 May 18, 1994.
 
 Before: BOGGS and NORRIS, Circuit Judges; and BELL, District Judge.*
 PER CURIAM.
 
 
 1
 Defendants Eugenio Estrada and Eusibio Toledo-Yin appeal from their convictions, under 21 U.S.C. Secs. 841 and 846, for possession with intent to distribute cocaine base ("crack cocaine"), distribution of crack cocaine, and conspiracy to commit those crimes. On appeal, they raise a number of issues related to the Fourth Amendment, judicial discretion in conducting a trial, effectiveness of counsel, and the Sentencing Guidelines. However, for the reasons set forth below, we affirm their convictions and sentences.
 
 
 2
 * Officer Joyce of the Columbus Police Department was part of a team investigating cocaine and crack distribution in his city. He called David Vento's pager number to arrange a buy. Vento arranged for the purchase to take place at 391 1/2 Forest Street (the "Forest Street house"). Since some of Vento's associates knew that Joyce was in law enforcement, Officers Meeker, Kididis, and Fields went in his stead to the Forest Street house at the designated time. They gave Vento $300 for crack cocaine, and he told them to wait in his apartment because he had to leave the premises to obtain the crack. Vento departed together with Nancy Wycoff, his girlfriend, and returned an hour later to complete the drug sale. At the transaction's conclusion, the officers arranged with Vento to return the following evening for a purchase of one ounce of crack cocaine and one ounce of cocaine powder.
 
 
 3
 Officers Meeker and Kididis returned to the Forest Street house the following night, while a team of other officers conducted surveillance outside. Again, Vento told the buyers that he would first need to contact his supplier. Meeker and Kididis then left Vento's apartment in order to notify the surveillance team that the supplier would be en route. The officers returned some forty-five minutes later. Estrada and Toledo-Yin, traveling in a yellow Cadillac, arrived at the apartment. They were wearing leather coats and were not conspicuously carrying anything. They went with Vento into a back bedroom that had a set of scales. After a loud discussion ensued, Vento came out and asked his buyers for the agreed $2300 purchase price. The officers handed him the money, which had been marked. Vento returned to the back bedroom with the cash, and the defendants left the apartment a few moments later. Vento then gave the officers one ounce of cocaine powder and one ounce of cocaine base. Upon the sale's completion, police officers raided the apartment, pursuant to a search warrant that they had obtained earlier in the day. They found a small plastic bag containing crack cocaine, a triple beam scale, and other drug paraphernalia. They arrested Vento.
 
 
 4
 Meanwhile, Detective Buhacevich had recognized the yellow Cadillac as belonging to Pedro Rodriguez, and he had seen it previously at known crackhouses. As he started to follow the car after the defendants drove away from Vento's home, he received a radio communication from Officers Meeker and Kididis, notifying him that the people in the vehicle were the suppliers who had just provided the cocaine to Vento, and they were in possession of the "buy money."
 
 
 5
 The police stopped the yellow Cadillac and arrested the two men, removing Estrada from the driver side and Toledo-Yin from the front passenger side. During the ensuing search that was conducted incident to the arrest, police found the marked $2300 "buy money" in Toledo-Yin's coat pocket. Next, the police impounded the Cadillac and conducted an inventory search of the vehicle, consistent with their standard procedure. They found 47.2 grams of crack cocaine on the floorboard where Toledo-Yin had been sitting, and they arrested both defendants.
 
 
 6
 Because the suspicious vehicle belonged to Rodriguez, police next obtained a warrant to search Rodriguez's home on Cushing Drive (the "Cushing Drive house"). During the search, they found 583.7 grams of crack cocaine and 1.6 kilograms of cocaine powder. They also found digital scales, plates with cocaine residue, baggies, razor blades, utensils used to cook crack cocaine, a crack cocaine cookie,[1] a .380-caliber semi-automatic pistol alongside a loaded clip for that gun, another handgun, receipts for Western Union money transfers, and $2,850 cash. Estrada's fingerprints were later found on the plates that had cocaine residue, and Western Union records later showed that Estrada, Pedro Rodriguez, and his girlfriend, Noemi Rodriguez, had wired a total of $96,000 to Toledo-Yin during the seven months between July 1991 and February 1992. Police arrested Pedro and Noemi Rodriguez.
 
 
 7
 In a fifteen-count superseding indictment, which included the information derived from Western Union, the grand jury charged Estrada, Toledo-Yin, Vento, Pedro Rodriguez, and Noemi Rodriguez with a wide range of federal narcotics violations. Vento and Pedro Rodriguez entered into an understanding with the Government, pleading guilty and agreeing to testify against Estrada and Toledo-Yin. After a jury trial, Estrada and Toledo-Yin were each convicted on Counts 1, 5, and 6 of the superseding indictment. Count one charged that they had conspired to distribute, and to possess with intent to distribute, cocaine base and cocaine powder, in violation of 21 U.S.C. Sec. 846. Count five charged that they had possessed with intent to distribute over fifty grams of cocaine base, in violation of 21 U.S.C. Sec. 841(a)(1) and (b)(1)(A)(iii). Count six charged that they had distributed over five grams of cocaine base, in violation of 21 U.S.C. Sec. 841(a)(1) and (b)(1)(B)(iii). Estrada, classified in criminal history category V with an offense level of 36, was sentenced to 300 months on Count 1 and 300 months on Counts 5 and 6, both sentences to be served concurrently. Toledo-Yin, classified in criminal history category III with an offense level of 43, was sentenced to life imprisonment on Counts 1 and 5 and to 480 months on Count 6, both sentences to be served concurrently.[2]
 
 II
 
 8
 Defendants contend that the district court erred when it denied their motion to suppress the physical evidence that police obtained during their warrantless search of Rodriguez's Cadillac. However, the courts have traditionally interpreted the Fourth Amendment to allow law enforcement officers greater leeway when conducting warrantless searches inside vehicles than they enjoy when searching homes or offices without a warrant.
 
 
 9
 The "automobile exception" dates back to Carroll v. United States, 267 U.S. 132 (1925). More than half a century later, the Court elaborated on the "automobile exception":
 
 
 10
 There are essentially two reasons for the distinction between automobiles and other private property. First, as the Court repeatedly has recognized, the inherent mobility of automobiles often makes it impracticable to obtain a warrant. In addition, the configuration, use, and regulation of automobiles often may dilute the reasonable expectation of privacy that exists with respect to differently situated property.
 
 
 11
 Arkansas v. Sanders, 442 U.S. 753, 761 (1979) (citations omitted), modified on other grounds, 456 U.S. 798 (1982). Even when a car is impounded for a municipal parking violation, the police may enter the car to inventory all items in plain view, may open an unlocked glove compartment, and may seize anything illegal that they happen to discover in the process. South Dakota v. Opperman, 428 U.S. 364 (1976). In the Court's view:
 
 
 12
 Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.
 
 
 13
 The expectation of privacy as to automobiles is further diminished by the obviously public nature of automobile travel.... "A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view."
 
 
 14
 ....
 
 
 15
 When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection [of] the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger.... In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned.
 
 
 16
 ....
 
 
 17
 [T]his Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents.
 
 
 18
 Id. at 368-73 (citations omitted) (footnotes omitted).
 
 
 19
 The "automobile exception" that permits warrantless searches inside vehicles is broad, but it is restricted by the caveat that the searching officers must have probable cause to believe that the vehicle contains contraband. United States v. Ross, 456 U.S. 798, 807-09 (1982). In this case, the police had probable cause to search the Rodriguez car that Estrada was driving for Toledo-Yin. Officers Meeker and Kididis had radioed their surveillance unit after they had just purchased drugs from Vento. The police had good reason to suspect that the defendants were Vento's suppliers and that additional contraband would be found in the car. Moreover, since the police impounded the car immediately after arresting the defendants, they were permitted to conduct a routine inventory search.
 
 
 20
 Still, the defendants contend that the police abused the "automobile exception" in this case because the police could have arrested them immediately after they stepped out of the Forest Street house, before they ever got into the Cadillac. Instead, they maintain that the police patiently waited for their targets to get into the car, essentially setting up a "subterfuge" to justify a warrantless search. However, the outside surveillance team could well have felt that they lacked probable cause to arrest defendants until the inside "buy team" radioed the information that defendants were in fact Vento's probable drug suppliers. By then, both defendants were already driving away. Therefore, we affirm the district court's finding that the car search was lawful.
 
 III
 
 21
 Defendants next contend that the trial judge abused his discretion by interjecting himself too frequently into the proceedings. We have reviewed the record, the rulings by the judge that occasionally limited the scope of cross-examination, and the comments that he made during defense's closing argument. We find no abuse of discretion.
 
 A. The Conduct of the Trial
 
 22
 "Trial judges retain wide latitude 'to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " United States v. Blakeney, 942 F.2d 1001, 1022 (6th Cir.) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)), cert. denied, 112 S.Ct. 881 (1992). "[T]he extent of cross-examination is within the 'sound discretion' of the trial judge.... Plainly, there must be some limitation upon such questions, or the trial becomes a trial of the witness and not of the defendant." United States v. Touchstone, 726 F.2d 1116, 1122-23 (6th Cir.1984) (citations omitted).
 
 
 23
 In Blakeney, the trial court allowed the defendant to cross-examine a witness to show possible bias or ulterior motives. However, the district judge did bar certain questions as irrelevant. This court upheld the district judge's rulings:
 
 
 24
 [T]he cross-examination afforded defense counsel was adequate to develop the issue of bias. Counsel was able to make a record from which to argue why [the witness] was biased.... Blakeney, therefore, was not denied the right of effective cross-examination in violation of the sixth amendment.
 
 
 25
 942 F.2d at 1023. In United States v. Slone, 833 F.2d 595, 601 (6th Cir.1987), we upheld a conviction where a trial judge had limited appellant's cross-examination of a witness. "Because the trial judge did not deny cross-examination altogether nor did he arbitrarily curtail cross-examination upon a proper subject, but instead merely prevented appellant from belaboring his point, the trial judge did not abuse his discretion." Id. at 601.
 
 
 26
 In this case, although the trial judge limited some questioning of prosecution witness Vento, he permitted the defense to cross-examine him at some length. Indeed, Vento's cross-examination runs more than seventy transcript pages. Similarly, the judge acted within his discretion when he limited overlapping questions by different defense counsel and when he set guidelines as to when defense counsel could play an audio recording of Detective Joyce interrogating the defendants.
 
 
 27
 B. The Judge's Comments During Closing Argument
 
 
 28
 During the trial, a Drug Enforcement Agency (DEA) chemist, Skowronski, was asked about tests that he had conducted on the "crack cocaine cookie" that had been found in the Rodriguez home. During his closing argument, Toledo-Yin's attorney referred to that earlier testimony and drew conclusions that twice led the prosecutor to object that the testimony was being misrepresented. The trial judge interjected, clarifying the earlier testimony that might have confused some jurors.
 
 
 29
 "In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct...." United States v. Hickman, 592 F.2d 931, 932 (6th Cir.1979) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)). It is the judge's "duty to see that the issues are not obscured and that the testimony is not misunderstood." Id. at 933. In Hickman, this court reversed and remanded for a new trial based on a trial record that saw the district court interject itself in the proceedings more than 250 times--even though it was only a one-day trial. Id. at 932, 936.
 
 
 30
 By contrast, in this case the judge interjected briefly during defense counsel's closing argument, in response to two consecutive objections by opposing counsel, who contended that the defense attorney was misrepresenting evidence in a potentially critical way. The judge's remarks were aimed at clarifying an expert's earlier testimony that could have confused some jurors, especially in light of the defense counsel's potentially misleading characterization of that testimony. In the second of his two brief comments, the judge told the jurors to rely on their own recollection of what they had heard. We hold that the judge acted properly.
 
 IV
 
 31
 Toledo-Yin contends for the first time on this appeal that he did not have effective assistance of counsel at trial. This court does not review claims of ineffective assistance of counsel that are raised for the first time on appeal. See, e.g., United States v. Martin, 920 F.2d 345, 349 (6th Cir.1990), cert. denied, 111 S.Ct. 2038 (1991); United States v. Swidan, 888 F.2d 1076, 1081 (6th Cir.1989).
 
 V
 
 32
 The defendants also contest the district court's determination of the quantity of drugs involved in the conspiracy. A district court's factual findings regarding the amount of drugs attributable to a defendant for sentencing purposes is reviewed for clear error. United States v. Walton, 908 F.2d 1289, 1300-01 (6th Cir.), cert. denied, 498 U.S. 906, 989-90 (1990).
 
 
 33
 We have reviewed the record and find no error in the court's calculations, which were adopted from the Presentence Investigation Report (PSI). The court correctly held defendants responsible for: the drugs that were purchased by the undercover police at Vento's apartment on the night that defendants were arrested; the additional drugs that were uncovered by the police during their subsequent raid of Vento's Forest Street premises; the drugs uncovered by the police during their search of the yellow Cadillac; and the drugs uncovered by the police during their authorized search of Rodriguez's Cushing Drive premises.
 
 
 34
 In addition, the court properly calculated the Western Union records of funds transferred to Toledo-Yin by Estrada and the two Rodriguezes, converting those drug proceeds into equivalent quantities of cocaine powder based on that substance's street price at the time of the respective offenses. Furthermore, the court properly included against Toledo-Yin the additional drugs and proceeds that Rodriguez revealed after he began cooperating with the Government. We find no error in the court's calculations.
 
 VI
 
 35
 Estrada further claims that his "job was principally to act as Toledo-Yin's chauffeur or driver, and occasionally as a small time distributor." Therefore, contending that he merely played a minor role, he appeals from the court's finding that he should be held accountable for the drugs that were uncovered at the Rodriguez home. However, the record clearly shows that: (1) Estrada personally delivered drugs to Rodriguez's house and brought them inside from the Rodriguez Cadillac; (2) Estrada's fingerprints were found on plates with cocaine residue that were found in Rodriguez's kitchen; and (3) after Toledo-Yin finished cooking a delivery of cocaine on Rodriguez's kitchen stove, preparing it to become crack cocaine, Estrada participated significantly in the process, methodically breaking the crack cocaine cookie into smaller-weight "rocks," thereby preparing the crack for sale in marketable sizes.
 
 
 36
 As to Toledo-Yin's claim that there were not at least five people in the criminal activity that he led, the record reflects the participation of Toledo-Yin, Estrada, Pedro Rodriguez, Noemi Rodriguez, Vento, and others, including those in the several crackhouses that Toledo-Yin ran in Columbus. Therefore, the district court's finding was not erroneous, and the court properly assessed against Toledo-Yin a 4-level enhancement, under U.S.S.G. Sec. 3B1.1(a), based on his role as the organizer or leader of a criminal activity that involved five or more participants. Similarly, based on information provided by Government informants Vento and Rodriguez that he had offered each of them financial inducements to lie about his role, Toledo-Yin was properly assessed an additional 2-level enhancement, under U.S.S.G. Sec. 3C1.1, for obstructing or impeding the administration of justice.
 
 VII
 
 37
 For the foregoing reasons, the convictions and sentences of defendants Eugenio Estrada and Eusibio Toledo-Yin are AFFIRMED.
 
 
 
 *
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The preparation of crack cocaine from cocaine base requires that it be cooked, usually in small pots. The finished product, a hard white substance, is known as a "crack cocaine cookie."
 
 
 [2]
 Charges against Noemi Rodriguez, the fifth indicted co-conspirator, were dropped after the jury could not reach a verdict and a mistrial was declared