**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Aziz DIAKITE and Ibrahim Fofana,**
**Defendants–Appellants.**

No. 00–1751, 00–1901.

United States Court of Appeals,
Sixth Circuit.

Feb. 22, 2001.

Before BOGGS and MOORE, Circuit Judges, and BELL,* District Judge.

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

PER CURIAM.

Co-defendants appeal judgments of conviction and sentence entered following a consolidated jury trial. Diakite and Fofana were two of 32 defendants named in a twenty-six count indictment stemming from a scheme to obtain citizenship for several citizens of Ivory Coast by entering into sham marriages and filing petitions for immediate-relative visas. Count 1 charged Diakite and Fofana, among others, with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, while Count 22 charged Diakite alone with visa fraud, in violation of 18 U.S.C. § 1546. Both defendants pleaded not guilty and proceeded (with two other defendants not parties to this appeal) to a jury trial, which resulted in their conviction on all charges. We affirm.

I

Aziz Diakite was born in Katiola, Ivory Coast, and was a citizen of that country when he entered the United States at Kennedy Airport on a short-term tourist visa on February 20, 1991. Diakite overstayed his visa but escaped INS attention until Shakwain Shantay, whom Diakite had married, filed a petition to adjust his status to permanent resident. The INS denied the application in 1996 as based on a sham marriage because the American consulate in the Ivory Coast could not obtain proof of Diakite's divorce from his Ivoirian wife, Amy Kaba. Diakite eventually divorced Shantay. Meanwhile, the INS had denied his 1993 application for asylum. Undaunted and willing to try his luck on the third of four methods of obtaining legal residence in the United States, Diakite entered *and won* the 1998 lottery for "di-

versity" visas, but his application for status adjustment was denied when American officials in the Ivory Coast could not verify Diakite's graduation from secondary school. Tenacious to the end, Diakite entered another marriage on April 6, 1999, taking as his bride Sheila McFarland, who was paid $700 for her participation in a ceremony held in Findlay, Ohio. Two months later, McFarland filed a petition for an immediate-relative immigration visa and an application to adjust status. Diakite submitted Form I–485, an application to register permanent residence or adjust status, which contained several false statements. Diakite lied about living with his wife, the location of his residence, and the fact that he never sought to procure a visa by fraud.

McFarland married Diakite just a day after making his acquaintance, having been told by a friend that she would receive $1500 in two equal installments if she married an Ivoirian and helped him adjust his immigration status. She never lived with Diakite. Diakite, for his part, occasionally dropped by her home with INS documents for her signature and instructed her to tell the INS that they lived together. Federal agents found Diakite living with his original Ivoirian wife in a Flint, Michigan, apartment.

Ibrahim Fofana was born in Abidjan, Ivory Coast, and became a citizen of Mali before entering the United States at New York City on a two-month visa in late 1994. He remained in the country after his visa expired. Following a summer 1998 automobile accident, he moved to Flint, Michigan, where his oldest brother—and alleged conspiracy ringleader— Nganio "Noha" Fofana took care of him. On September 25, 1998, Ibrahim Fofana married Tamara Lynn Malone in a Findlay, Ohio, ceremony. The union has produced one child, and the government has not claimed that the marriage was a fraud or that Malone had been paid to enter it. On two occasions, Ibrahim Fofana drove a van full of recently introduced couples to Findlay for their marriages, assuring them that everything would be "all right." On one or two occasions he dropped newlyweds off at the Detroit INS office. Once, while Noha Fofana was absent from his Flint hair-braiding shop, Ibrahim handed money to one of the other defendants.

Noha Fofana collected between $3000 and $10,000 from aliens seeking U.S. citizenship, recruited (and paid others to help recruit) American brides, paid the Americans for marrying their husbands and for filing the appropriate INS forms, helped or arranged for others including Diakite to help the newlyweds fill out and file the INS documents, arranged for transportation to Findlay, Ohio, and probably paid Rev. John Oliver for his services. Diakite assisted Noha by counseling the participants on the obligations of marriage, completing or helping couples complete and file the INS forms, and—on at least two occasions—driving the betrothed to Findlay.

Diakite and Noha Fofana met Tasha Coleman at Noha's hair-braiding shop in 1999. Coleman had been sent to the shop by a friend who informed her that she could make money by getting married and that she would not have to sleep or live with her spouse. Coleman met with Diakite on two consecutive days in July 1999 to discuss her impending marriage. She learned that she would be paid $1500 and that she would not have to live or have sexual relations with her husband. Coleman gave Diakite her birth certificate, along with other identification documents, and was introduced to her prospective spouse, co-defendant Feranba Keita. On the day of the ceremony, Coleman, Keita, Diakite, and Ibrahim Fofana traveled in a

mini-van to Findlay, Ohio, where Rev. Oliver performed the wedding. Diakite paid for the Ohio marriage license, and Ibrahim Fofana gave Coleman her wedding band. She next saw Diakite when she visited the hair salon to deliver her husband's mail. Sometime later, also at the hair shop, Coleman's husband Keita gave her $100. Diakite interceded, instructing her not to ask Keita for more money in the future but to contact him instead.

Sheila McFarland, Diakite's American wife, contacted her godsister Melanie Vaughn and asked her if she knew of anyone who wanted to marry an African. Vaughn promptly volunteered, learned of the details, and married Allassane Doumbia in a Findlay, Ohio, ceremony, at which Diakite and Ibrahim Fofana served as witnesses. On the night of her wedding, Noha Fofana paid Vaughn $750.

A friend asked Keisha Jackson if she wanted to marry somebody for money. Jackson agreed to do so but made clear to her spouse, whom she met the day before the marriage, that it was just a "business matter" so that he could obtain American citizenship. Jackson wanted no intimate relationship with her spouse and, not long after the ceremony, soured on the idea of marriage altogether, informing him on numerous occasions that she wanted a divorce. Diakite met with Jackson in the winter of 1999 on a park bench and tried to get her to remain married to and move in with her husband in order to keep up appearances for the INS's benefit. Diakite suggested that if she did not actually move in, she should at least leave some clothes and pictures in her husband's home so that the INS would think she lived there.

The district court included in its jury charge with respect to Ibrahim Fofana willful-ignorance and flight-as-awareness-of guilt instructions, to which Fofana ob-

jected. After the jury convicted Fofana, the court ruled that he should be sentenced under USSG § 2L2 .1, instead of § 2L2.2, and imposed an 11–month sentence. Fofana timely appealed.

The district court determined that the base offense level for conspiracy to defraud the United States is 11, under USSG §§ 2X1.1 and 2L2.1. Over Diakite's objection, the court imposed a three-level upward adjustment for participation as a manager or supervisor of the offense, under USSG § 3B1.1(b). Grouping the conspiracy charge with the visa fraud charge resulted in a combined adjusted offense level of 15. As Diakite had no criminal history, the applicable sentencing range was 18–24 months. The district court sentenced him to two concurrent terms of imprisonment for 24 months, followed by two years of supervised release. Diakite timely appealed.

## II

When a defendant preserves his right to appeal certain jury instructions by timely raising an objection in the district court, this court's role is limited to reviewing the instructions to decide "whether the charge taken as a whole, fairly and adequately submit[ted] the issues and applicable law to the jury." *United States v. Lee*, 991 F.2d 343, 350 (6th Cir.1993). In reviewing a sentencing determination, this court "accept[s] the findings of fact of the district court unless they are clearly erroneous and ... give[s] due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). It is a legal question subject to de novo consideration whether given facts warrant the imposition of a particular offense guideline such as USSG § 2L2.1 or the enhancement of a sentence pursuant to § 3B1.1. *See United States v. Owusu*, 199 F.3d 329, 345

(6th Cir.2000); *United States v. Gort–Di-Donato,* 109 F.3d 318, 320 (6th Cir.1997).

### A. Defendant Ibrahim Fofana

Ibrahim Fofana attacks two jury instructions given over his objection: the standard Sixth Circuit instruction on deliberate ignorance, *see* Sixth Circuit Pattern Criminal Jury Instructions § 2.09, and an instruction on flight as consciousness of guilt, *see* Sixth Circuit Pattern Criminal Jury Instructions § 7.14 (modified by the district court).

As Instruction No. 25 of a 42–instruction charge, the district court stated:

Next, I want to explain something about a defendant's knowledge.

No one can avoid responsibility for a crime by ignoring the obvious. If you are convinced that the defendants deliberately ignored a high probability that the people they were helping were committing marriage fraud and submitting false documents to the Immigration and Naturalization Service, then you may find that they knew that they were committing marriage fraud and submitting false documents to the Immigration and Naturalization Service.

But to find this, you must be convinced beyond a reasonable doubt that the defendants were aware of a high probability that the people they were helping were committing marriage fraud and submitting false documents to the Immigration and Naturalization Service, and that the defendants deliberately closed their eyes to what was obvious. Carelessness, or negligence, or foolish-

ness on their part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

Fofana argues that the facts of this case did not warrant a deliberate-ignorance instruction because merely having recent immigrants present when marriages are performed is not the type of crime that warrants a deliberate ignorance instruction. According to Fofana, no evidence supported the theory that he was "deliberately closing his eyes to the obvious risk that he [wa]s engaging in unlawful conduct," *United States v. Gullett,* 713 F.2d 1203, 1212 (6th Cir.1983), in that his only acts in furtherance of the conspiracy were presence at two of the phony marriages in Findlay and "running a few errands for his brother" by driving a car. In addition, Fofana argues that conspiracy to defraud the United States and visa fraud, unlike "controlled substance offenses and fraud," are not "obvious crimes" and therefore are not the kinds of crimes in which a deliberate ignorance instruction is appropriate.

In drafting this circuit's model criminal jury instructions, the Sixth Circuit District Judges Association stated with respect to § 2 .09: "This instruction should be used only when there is some evidence of deliberate ignorance." Fofana has not cited a case addressing what facts will support or fail to support issuing the deliberate ignorance instruction—because none currently exist.[1] This court has recognized, however, that even if a defendant were correct and the instruction improper, giving a deliberate ignorance instruction when the facts in evidence do not support such a theory of guilt will generally be harmless

---

1. This court's cases resolving challenges to deliberate ignorance instructions typically turn on whether the language of the instruction effectively reduced the *mens rea* of the crime to negligence or some other standard lesser than knowledge. *See, e.g., United States v. Lee,* 991 F.2d 343, 350 (6th Cir.1993) (ap-

proving of Pattern Criminal Jury Instruction 2.09); *United States v. Lawson,* 780 F.2d 535 (6th Cir.1985); *Gullett,* 713 F.2d at 1212; *United States v. Thomas,* 484 F.2d 909, 912–914 (6th Cir.1973). In this case, the language of the instruction tracked the pattern instruction perfectly.

error, as long as the instruction correctly stated the law. *See United States v. Mari,* 47 F.3d 782, 786 (6th Cir.1995) (explaining: "Quite simply, a district court can err in giving the instruction only when there is insufficient evidence to support a verdict based on deliberate ignorance, and on these occasions, the jury will not base the guilty verdict on the instruction. Rather, it will consider the theory, and then dismiss it for what it is—mere surplusage, a theory of scienter that is insufficient to support the conviction."); *see also United States v. Monus,* 128 F.3d 376, 390 (6th Cir.1997). Since the district court's instruction correctly stated the law and the ample evidence of Fofana's suspicious conduct supported either actual knowledge on his part or the deliberate-ignorance theory of knowledge, the defendant's first argument is meritless.

Fofana's second attack on the deliberate ignorance instruction similarly lacks merit, as the facts of this case show. Fofana conveniently understates his role in the conspiracy. In addition to driving obviously new couples across a state line to obtain a no-waiting-time marriage, Fofana took two couples who had just been introduced to Meijer to purchase wedding rings, made a cash payment to a bride around the time of her wedding and then picked her up a week later to fill out immigration forms, and picked up "stacks" of immigration forms from the International Institute in Flint. Given Fofana's argument at trial that he did not know that the couples he drove to Findlay were entering sham marriages, this was precisely the kind of case in which, after explaining how a finder of fact may infer the required mental state from a defendant's actions, a court may instruct a jury on a defendant's deliberate ignorance of an obvious risk that he is engaging in unlawful conduct. Therefore, we decline Fofana's invitation to adopt a categorical rule banning deliberate igno-rance instructions in sham-marriage visa fraud cases.

■ Modifying Sixth Circuit Pattern Criminal Jury Instruction 7.14, the district court instructed the jury on flight as consciousness of guilt:

You have heard testimony that after the crime was supposed to have been committed, the defendant Ibrahim Fofana attempted to run when agents came to arrest him.

If you believe that the defendant attempted to flee, then you may consider this conduct, along with all the other evidence, in deciding whether the government has proved beyond a reasonable doubt that he committed the crime charged. This conduct may indicate that he thought he was guilty and was trying to avoid punishment. On the other hand, sometimes an innocent person may run to avoid being arrested, or for some other innocent reason.

An agent testified that the arresting officers had been wearing plain clothes without identifying symbols and sitting in an unmarked vehicle parked near Fofana's residence on the day of his arrest. These agents had not even stepped out of their vehicle when Fofana left his building and began to run.

Fofana argues that the evidence did not support the flight instruction because "[a]bsolutely no evidence was presented during the trial to establish that Ibrahim Fofana knew on the day that he was arrested that he had been indicted by a Grand Jury and that an arrest warrant had been issued for him." Def. Fofana Br. at 13–14. He has pointed to no authority in this circuit or elsewhere requiring evidence of knowledge by the defendant of the particulars of his possible apprehension as a prerequisite to a flight-as-consciousness-of-guilt instruction.

Fofana observes that his flight from justice in early January 2000 occurred long after what he claims was his last criminal act, participation in a September 1999 wedding, and argues that such a lapse diminishes the legitimacy of a guilt inference to the point where prejudice outweighs the probative value of flight evidence. Fofana also draws the court's attention to the argument that the Supreme Court remains leery of the probative value of flight evidence and that other circuits permit the prosecution to argue for the guilt inference from evidence of flight but do not authorize courts to give a flight-as-consciousness-of-guilt instruction.

This court has refused to impose an immediacy or proximity requirement in cases of flight, *see United States v. Touchstone*, 726 F.2d 1116, 1119–20 (6th Cir. 1984) (approving introduction of evidence of flight and a jury instruction on flight when the defendants deliberately absented themselves from trial three years after the offense conduct), and has held that "juries are given the power to determine 'how much weight should be given to such evidence .'" *Id.* at 1119 (quoting *United States v. Craig*, 522 F.2d 29, 32 (6th Cir. 1975)). *Touchstone* noted in dicta that proximity of flight to the crime may become important when the defendant's knowledge of the charges against him are doubtful (Fofana claims he did not know he was under indictment, while the government notes that most of his co-conspirators had been indicted a month earlier). However, *Touchstone* in no way required the government to prove that the defendant knew of the charges when the evidence showed that he fled apprehension less than four months after committing an act in furtherance of a long-running conspiracy. Accordingly, the district court did not err in omitting from the flight instruction a comment on the proximity of flight to the crime or a comment on knowledge of the

charges. *See id.* at 1120; *accord United States v. Dillon*, 870 F.2d 1125, 1128 (6th Cir.1989).

■ Fofana next challenges the district court's decision to use USSG § 2L2.1 instead of USSG § 2L2.2 in determining the base offense level for his conspiracy conviction. Fofana characterizes the former guideline as trafficking in documents while the latter "applies to the lesser conduct of simply participating in the fraudulent marriages but not being involved in the manufacture of fraudulent documents."

Fofana has misconstrued the two provisions. Section 2L2.1 covers trafficking in a document relating to naturalization, citizenship, legal resident status, or a passport; making a false statement in respect to the citizenship or immigration status of another; and "fraudulent marriage *to assist* alien to evade immigration law." USSG § 2L2.1 (emphasis added). By contrast, § 2L2.2 covers fraudulently acquiring documents relating to naturalization, citizenship, or legal resident status for one's own use; "false personation or fraudulent marriage *by alien* to evade immigration law;" and fraudulently acquiring or improperly using a United States passport. USSG § 2L2.2 (emphasis added). Both deal with fraudulent documents and sham marriages. The difference between them turns on whether the defendant is helping others to commit the fraud or personally receiving the benefit of the fraud. *See United States v. Principe*, 203 F.3d 849, 852 (5th Cir.2000) (observing a distinction between obtaining immigration documents or arranging sham marriages for other people and acquiring or using immigration documents to affect one's own immigration status).

The government has not contended that Ibrahim Fofana, an alien, entered a fraudulent marriage to evade immigration law.

Rather, the government prosecuted him for conspiring to commit visa fraud by facilitating fraudulent marriages that *assisted other aliens* to evade immigration law and actually assisting others in filling out fraudulent applications to adjust immigration status.

█ In the alternative, Fofana argues that the district court should have reduced his offense level by three levels because § 2L2.1(b)(1) requires such reduction when "the offense was committed other than for profit ...." USSG § 2L2.1(b)(1). Even if we accept that Ibrahim Fofana made no personal financial profit from the crime, we need not overlook that fact that the conspiracy was a profit-generating enterprise for its organizers, promoters, and certain participants. Fofana conspired with others to make a profit by defrauding the United States, even if he did not personally make money from the enterprise. The defendant is not entitled to the benefit of a guideline on profit that—in also covering defendants whose offense "involved the smuggling, transporting, or harboring only

of the defendant's spouse or child"—appears designed to cover defendants who assist close family members in obtaining a fraudulent immigration adjustment. The district court committed no error in sentencing Fofana.[2]

## B. Defendant Aziz Diakite

█ The government bears the burden of proving by a preponderance of the evidence the applicability of the § 3B1.1(b) enhancement for acting as a manager or supervisor of a criminal enterprise. *See United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir.2000). As this court recently held,

In general, "a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted." *Gort–DiDonato*, 109 F.3d at 321 (footnote omitted); *see also* USSG § 3B1.1 comment. n.2. In determining whether a defendant qualifies as a leader, organizer, manager, or supervisor, a trial court should consider a number of

---

**2.** According to Fofana, "The court showed obvious bias in favor of the government and against the defense throughout the trial." As evidence of bias, Fofana points to the district court's statements addressed to uncooperative witnesses and its management of the attorneys and presentation of evidence. As his sole citation to authority and argument on the point, Fofana states, "The appellant is certainly entitled to an impartial tribunal which, if not provided, a constitutional violation occurs. *Quercia v. United States*, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). That is what happened here." Def. Fofana Br. at 19. As the government points out, the conduct of a trial is generally committed to the discretion of the trial judge and will not be disturbed absent a clear showing of abuse of that discretion. *See United States v. Wade*, 364 F.2d 931, 936 (6th Cir.1966). Additionally, the rules of evidence explicitly grant the trial court power to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence ...." Fed.R.Evid. 611(a);

*see also United States v. Maddox*, 944 F.2d 1223 (6th Cir.1991). Decisions concerning the re-opening of examinations, limits placed thereon, and a variety of other matters affecting the orderly presentation of the proof call for the weighing of possible prejudice against other parties, the availability and efficiency of requiring alternative sources of the same evidence, the importance of the matter in question, and intangible factors that may facilitate or impede the orderly flow of a trial. *See United States v. Wilson*, 27 F.3d 1126, 1129 (6th Cir.1994). These are often judgment calls best made by the trial judge in the context of the whole proceeding.

In light of the broad deference afforded to district courts in managing trials—a deference especially important when the judge must deal with a witness who does not comprehend the questions or refuses to respond in an appropriate manner—the hint of frustration on the trial judge's part does not even approach the verge of a clear abuse of discretion.

factors, including but not limited to the defendant's exercise of decision-making authority, any recruitment of accomplices, "the claimed right to a larger share of the fruits of the crime," the degree of participation in planning the offense, and the degree of control the defendant exercised over others. USSG § 3B1.1 comment. n.4.

*Vandeberg,* 201 F.3d at 811.

Diakite argues that the facts adduced at trial and described in the pre-sentence report (PSR) do not support a conclusion that he acted as a manager or supervisor of the criminal activity. The trial testimony of co-conspirators, Diakite claims, does not indicate that he possessed or exercised decision-making control over others, but instead suggests that he acted at the behest of Noha Fofana or other unidentified higher-level conspirators. Diakite's name does not appear among the PSR's list of recruiters who located American citizens willing to enter sham marriages with Africans. The government did not prove that Diakite received any remuneration for his role in the conspiracy, much less that he "claimed a right to a larger share of the fruits of the crime." Finally, Diakite argues that nothing in the record establishes that he planned any aspects of the offense, as opposed to simply following orders or assisting others in their own conspiratorial acts. In his view, riding in a mini-van driven by Ibrahim Fofana to Findlay, Ohio, explaining the procedures for entering into a sham marriage, assisting others to complete INS forms, and encouraging Keisha Jackson to reconcile her marriage and refrain from seeking a divorce do not show exercise of authority or control over others but instead are the acts of an ordinary participant in the conspiracy.

The district court based its sentencing decision on Diakite's actions with respect to two of the fraudulent marriages: Tasha Coleman–Feranba Keita and Keisha Jackson–Hamidou Kante. The court found that

Ibrahim Fofana turned Tasha Coleman over to this defendant, Aziz Diakite. Mr. Diakite explained the procedure for marriages, set up the arrangements for Ms. Coleman to marry which was to take place the very next day, drove with Ms. Coleman and Feranba Keita to Findlay, Ohio, paid Ms. Coleman and completed paperwork for the Immigration and Naturalization Service.

In addition, Mr. Diakite went to Keisha Jackson who was married to Hamidou Kante in an attempt to convince her not to get a divorce from Mr. Kante. Obviously, if she proceeded to get a divorce that would destroy the—the whole aura of a legitimate marriage because, as I recall, the marriages have to—they've got to [exist] for two years, I believe it is, before it will be considered as a—as a valid marriage for the purposes of gaining permanent residency in the United States. And obviously, if the woman then promptly files a divorce suit shortly after the ceremony that destroys the whole—the whole false impression that has—which the parties have attempted to create for the benefit of the Immigration and Naturalization Service. Mr. Diakite also attempted to convince Keisha Jackson to move some of her belongings in with Mr. Kante for purposes of any INS investigation.

The § 3B1.1 enhancements for role in the offense incorporate the long-recognized principle of punishing more severely those who bear greater relative responsibility for acts undertaken in furtherance of a joint criminal enterprise. *See* USSG § 3B1.1 comment. (backg'd); *see also United States v. Gaitan–Acevedo,* 148 F.3d 577, 595–96 (6th Cir.1998) (citing *United States v. Schultz,* 14 F.3d 1093, 1099 (6th

Cir.1994)). To enhance Diakite's sentence under the "manager or supervisor" provision of § 3B1.1(b), the government did not have to prove that he employed any of his co-conspirators or exercised ultimate decision-making authority. *See ibid.* The guidelines do require proof that "the defendant [was] the organizer, leader, manager, or supervisor of one or more other participants," USSG § 3B1.1 comment. (n.2) (as amended, effective November 1, 1993, *see* USSG Appendix C Amendment 500), a point recently recognized by this court. *See Vandeberg,* 201 F.3d at 811–12 (reversing imposition of a § 3B1.1(c) enhancement because playing an essential role in the crime by providing critical information does not qualify as supervision or management). The facts as found by the district court support the legal conclusion that Diakite played a leadership role in the conspiracy by supervising the actions of Keisha Jackson with respect to her sham marriage to Hamidou Kante and managing Tasha Coleman's marriage to Feranba Keita. The district court properly assessed the § 3B1.1(b) three-level enhancement.

### III

For the reasons set forth above, we AFFIRM the judgments of conviction and sentence as to Aziz Diakite and Ibrahim Fofana in all respects.